## Richmond

SARAH ELIZABETH WATSON V. ROGER SHEPARD, ET AL.

November 24, 1976.

Record No. 751397.

Present, All the Justices.

*Douglas R. Schwartz (Claude M. Lauck,* on brief), for appellant.

*William F. Quillian, III,* for appellees.

COMPTON, J., delivered the opinion of the court.

This appeal arises from a dispute over custody of Judith Dawn Watson, now approximately six years of age. The contestants are the natural mother, on the one hand, and the paternal aunt and her husband, who seek to adopt the child, on the other. The natural father is deceased. The adoptive parents are divorcing.

The appeal stems from two separate proceedings which were consolidated and heard *ore tenus* by the chancellor. Appellees Roger Dale Shepard and Cynthia Gail Watson Shepard filed on March 1, 1974 in the court below a petition to adopt the child and

to change her name. Code § 63.1-220, *et seq.* Thereafter, on February 28, 1975, appellant Sarah Elizabeth Watson, the child's natural mother, petitioned the court for an award of custody, Judy having been in the Shepards' custody pursuant to a June 28, 1973 order of the Juvenile and Domestic Relations District Court for Campbell County. Following the hearing in May 1975, the trial court (1) entered an interlocutory adoption order, Code § 63.1-226, in favor of the Shepards, and (2) denied the mother's petition for a change of custody; we awarded the mother an appeal from these July 30, 1975 orders.

The Watsons were married in November 1969 when the mother was 16 years old; the father, a construction worker, was 18. The child was born in Lynchburg 15 months later and lived with her parents throughout the course of their turbulent marriage, during which the father used alcoholic beverages to excess, experienced violent fits of rage, and inflicted physical and mental abuse on the mother. The Watsons separated in January 1973 and Judy remained with her mother for the next two months. The evidence showed during March 1973, Judy's father asked his sister, Mrs. Shepard, a resident of Campbell County, to keep the child because the mother "didn't want to take care of Judy and he needed to find a home for her". Mrs. Shepard consented, but after a week the mother told Mrs. Shepard "she was going to settle down and wanted Judy back", so the child was returned to the mother. Another week passed and the father brought Judy back to the Shepards' home.

The Shepards, concerned because Judy was being "jerked back and forth", then discussed with the child's father "the fact of starting to get legal custody". The Shepards, in their mid-twenties and natural parents of a daughter about 16 months older than Judy, desired to establish a regular baby-sitting schedule for the two children and to make financial arrangements for their care because both Shepards were employed outside the home, Shepard then as an insurance agent and his wife as an insurance company data analyst.

Following the Watsons' separation, the mother began working in an Altavista drive-in restaurant. She leased a house trailer and testified "there wasn't no way that I could take care of Judy working and paying a baby sitter and keeping food in the trailer and paying the rent, too." In addition, the mother testified she was "deathly scared" of her husband, who threatened to kill the

mother if she tried to "get" Judy from the Shepards again. The mother further testified she knew Judy "would be better off with [the Shepards] ... until I could get myself straightened out."

Consequently, on June 9, 1973, the mother executed a notarized "statement", not introduced in evidence in these proceedings, which read, according to the testimony, "I give my consent for Roger and Cynthia to have custody of [my] daughter, Judith Dawn. ..."

Thereafter the Shepards initiated custody proceedings in the Campbell County juvenile court. The child's "temporary care and custody", according to the mother's allegations in the instant petition for change of custody, was awarded by the court to the Shepards during a "first hearing" on June 11, 1973. The record shows such custody was granted upon request of the child's father and upon "the signed statement of her mother." Subsequently, during the course of a court-authorized investigation for a June 28, 1973 hearing on the Shepards' custody petition, Virginia M. Babcock, probation officer supervisor for the juvenile court, discussed with the mother her reasons for desiring to relinquish custody of Judy to the Shepards. Mrs. Babcock testified in the instant proceeding that:

> "[The mother] said her daughter was better off with the Shepards. She said she is too wild to look after the child. According to her she is 20 years old and she wants to live and have a good time before she settles down. Beth [the mother] said she expected to try to regain the custody when she had settled down."

Mrs. Babcock also testified she tried, unsuccessfully, to convince the mother at that time to reconsider her decision to relinquish custody. When asked if she then concluded whether the mother was an unfit parent, Mrs. Babcock answered that the mother was "living in an environment in which there was a man to whom she was not married and ... this was not in the best interest of the child to be in that environment".

Following the hearing on June 28, at which the mother, although notified, did not appear, the juvenile court entered the following order:

> "The court having this day read the Probation Officer's Report of Mrs. Virginia M. Babcock, Probation Officer

Supervisor of this Court, and having heard the evidence in this case, doth award the custody of Judith Dawn Watson to Roger D. Shepard and Cynthia W. Shepard with the right of the parents to visit said child at all reasonable and proper times."

In September 1973, Judy's father was killed in a motorcycle accident. Subsequently, the Shepards' petition for adoption was filed in March 1974 and the mother began visiting the child in the Shepards' home in May 1974. When asked why she made no effort to visit her child during a period of about 14 months beginning in March 1973, the mother testified she thought the child would be upset by "jumping back and forth" between her and the Shepards; she stated, however, she thought "about that girl every day and I love her very much." The evidence shows that during this period, the mother inquired about the child's welfare, considered the custody arrangements temporary, and intended, in the future, to regain custody of the child.

In September 1974, the Shepards separated. Their relationship, at the time of the hearing, was thus described by Mrs. Shepard:

"We are friends and we intend to stay that way. We have no hard feelings against each other. It's just our ideals, as we have gotten older, are in different directions. So we just decided it was logical to separate."

Judy and the Shepards' daughter now live with Mrs. Shepard. The children are visited regularly once a week by Mr. Shepard. The Shepards' evidence shows there has been no substantial change in Mr. Shepard's "relationship" with his wife or the children since the separation. Judy's mother testified, however, that her child was "upset" because of the separation.

In October 1974, Judy's mother asked the juvenile court to establish specific and more liberal visitation privileges. At the time, the mother was visiting the child during a three-hour period on Saturday mornings in the Shepards' home. The mother's request was granted following a court investigation of the mother's living conditions and, during the eight months prior to the present hearing, the evidence shows the mother regularly has visited with Judy away from the Shepard home during each weekend.

At the time of the request for expanded visitation, the child's mother, then 21 years old, had been working as a "housekeeper"

since July 1974 for one Harvey Johnson in his home in rural Bedford County. Johnson, then 35 years of age and branch manager for a structural steel erector, was separated from his wife. Also living in Johnson's home were seven of his children whose ages ranged from eight to seventeen. Judy's mother moved to the Johnson home because, while unemployed and "staying with a girl in Bedford," she learned from one of Johnson's daughters that he needed a housekeeper. After residing in the home for several weeks, the mother commenced the housekeeping duties for which she is now paid $30 per week.

The mother occupies a room in the basement, which had been converted into two bedrooms and a recreation room by the use of partitions. Two of Johnson's sons, ages 15 and 17, occupy one bedroom and Judy's mother occupies the other, an area of about 15 by 28 feet which includes a bathroom. The mother testified she plans to remain in Johnson's home, engaged in her present employment, if she regains custody of her daughter; Johnson testified a bed for the child would be placed in the mother's room "where Judy could sleep."

Prior to her present employment, and subsequent to her separation from Judy's father in January 1973, the mother worked at the drive-in for about six months; at "Burlington Mills" for about six months, leaving there after her husband was killed because she "sort of [gave] up"; and at "Dudi-Duds" as a sewing machine operator until "they just told me they didn't need me no more", which was about one month before she went to live in Johnson's home.

In her February 1975 petition for change of custody the mother alleged she "has a stable home environment, adequate income and has arranged extremely comfortable living conditions for her child." During the May 1975 hearing, the mother, when asked her opinion as to her present ability to care for Judy, stated:

"Well, I have changed a whole lot since I have moved out there [to Johnson's home] and I think it is a good place. There are a lot of kids around for Judy to play with and I could be with her during the day and night."

She testified she now felt "stable" and "not wild".

Even though separated and planning a divorce, both Shepards during the hearing expressed the desire jointly to adopt Judy. Shepard testified he wished to accept the responsibility for Judy's support and education, and that the separation had no effect on his "willingness to go through with" the adoption. Mrs. Shepard stated:

"I want to adopt her because she is my daughter and she has been my daughter for over two years and I have been her mother to her. ... this adoption is only a legal formality to protect her and I so we can be assured that we will be together and that I am to be her mother to raise her and I have taught her and I had to get her to relax and I had to get her to trust me and I taught her that I would always be there, that my home was her home. I am her mother and she is my daughter."

The additional evidence presented by the Shepards during the lengthy *ore tenus* hearing, which included testimony from a clinical psychologist, showed that the child was happy and healthy in her present environment with Mrs. Shepard, especially in view of Judy's attachment to the Shepards' own daughter, Angie. Mrs. Shepard testified:

"They just cherish each other. Angie always wanted a little sister and one day there it was, you know, and when we first got Judy, Angie was in there working, just as hard as I was to make Judy feel at home. She was loved and this was her home and this was Judy's home. This is my half of the closet and this was her half. I mean everything she wanted to share with her, and they love each other dearly."

The mother's evidence showed that Judy was "withdrawn" while with her mother after regular visitation commenced in the Fall of 1974, but that during the following eight months their relationship improved; that the mother is now a more responsible and mature person as demonstrated by the efficiency with which she is attending to her assigned duties among the Johnson family; and, that even before custody was awarded to the Shepards, the mother cared for and attended to the needs of the child as best she could under the then-existing difficult circumstances.

During his comments from the bench following the hearing, the chancellor stated the evidence was "overwhelming that it is not in the best interest of the child to remove it from the Shepard home", and that he was "concerned" by the evidence that such removal would result in a "substantial, negative psychological impact upon the child" resulting in "emotional damage" for an undetermined period of time.

Subsequently, the orders appealed from were entered. In the order denying the mother's petition for a change of custody, the chancellor found "it is in the best interests of the said child that she remain in the custody of the said Shepards. . . ." In the interlocutory adoption order, the court below found that the Shepards "are financially able to maintain adequately and are morally suitable and proper persons to care for and train the said infant child; that Sarah Elizabeth Watson is not a fit person to have the custody of the said infant child; and that it is in the best interests of the said Judith Dawn Watson that she be adopted by Roger Dale Shepard and Cynthia Gail Watson Shepard." *See* Code § 63.1-226.

The mother contends the order denying her custody petition was "fatally deficient as a matter of law" because it was based solely on the child's best interest and contained no finding that she is an unfit parent, citing *Berrien* v. *Greene County Department of Public Welfare*, 216 Va. 241, 217 S.E.2d 854 (1975), and *Rocka* v. *Roanoke County Department of Public Welfare*, 215 Va. 515, 211 S.E.2d 76 (1975). She contends, alternatively, that even if a finding of unfitness had been set forth in the order, the evidence was insufficient to support such finding. As to the adoption proceeding, the mother argues the trial court's order therein was contrary to the evidence and also "legally insufficient." The Shepards argue the trial court's findings in both cases were fully supported by clear and convincing evidence.

The questions presented, therefore, are whether the trial court erred in denying the request for change of custody and in granting the petition for adoption. We do not completely agree with the arguments from either side of this controversy. We decide the trial court was right in denying the mother's custody petition, but wrong in granting the Shepards' adoption request.

■ We turn to the custody petition. Initially, the burden of proof ground rules must be established. The June 28, 1973

juvenile court order relieved the mother of Judy's custody and awarded her custody to the Shepards. That order was not merely *pro forma*, as the mother now contends, but it was based upon her voluntary relinquishment of custody, as evidenced by a written statement executed by her, upon results of a thorough investigation, and upon a hearing by a court of competent jurisdiction at which the report of investigation was considered and the evidence heard. Consequently, the mother's parental custody rights were altered and for her to be entitled to a later change in custody, the burden was upon her to show the circumstances had so changed since entry of the foregoing order that it would be in Judy's best interests to transfer custody to her; the burden was not upon the Shepards, as the mother argues, to show parental unfitness. *Dyer* v. *Howell*, 212 Va. 453, 456, 184 S.E.2d 789, 792 (1971). *See McEntire* v. *Redfearn*, 217 Va. 313, 316, 227 S.E.2d 741, 743 (1976).

The nature and effect of the June 28, 1973 order distinguish this case from *Rocka*, followed in *Berrien*, and from *Wilkerson* v. *Wilkerson*, 214 Va. 395, 200 S.E.2d 581 (1973), also relied on by the mother. In *Rocka*, as in *Berrien*, there had been no prior order by a court of competent jurisdiction which, as here, altered the parent's custody rights. In *Wilkerson*, a temporary order was entered by agreement to preserve the status quo during pendency of divorce proceedings. Such order had "neither the dignity nor effect", 214 Va. at 397, 200 S.E.2d at 583, of the order in this case, which was to remain effective to some indefinite time in the future when the mother decided she was through having "a good time" and had "settled down."

The foregoing determination that the burden was not on the Shepards to show parental unfitness eliminates the need to discuss whether the record supports a finding of such unfitness. We need be concerned only with whether the mother carried her burden to show circumstances had so changed between June 1973 and May 1975 that Judy's best interests would be served by a transfer of custody; we conclude the mother failed to sustain such burden.

According the trial judge's factual finding the presumption of correctness to which it is entitled, we hold the record fully supports the chancellor's determination that Judy's best interests will be served, at this time, by remaining in her present environment. The mother argues she has changed; that she has become stable, is settled, is no longer "wild", and is now capable

of properly caring for her child. But during the two-year period in question the mother has moved from job to job and from place to place, and has now decided to remain as a $30 per week housekeeper in the home of a man who is in the throes of a marital dispute. She plans to relegate Judy to a shared basement room among comparative strangers, removing her from a pleasant setting in which she has acquired a strong attachment to a "sister", Angie, as well as to Mrs. Shepard. Although the mother, due to her devotion to Judy, apparently is making an attempt to stablize her life to be in a position to give Judy proper care, the evidence fails to show Judy's best interests would be served at this time by a change of custody.

Now, we focus on the adoption proceeding. Under Code § 63.1-226, the court must be "satisfied" the child's best interest will be promoted by the adoption, before an interlocutory order may be entered. And it does not automatically follow the court should decide that those interests will be served by adoption, merely because the same evidence shows those interests will not be served by a custody transfer. Under the circumstances of this case, we are not satisfied adoption by this couple, while they are divorcing, will be in Judy's best interests.* Little imagination is required to anticipate the many additional future problems to be encountered by this child if the irrevocable step of terminating parental rights is approved at this time, even though no question is raised about the Shepards' present fitness as parents. For example, while the Shepards' separation seems "friendly" now, there is no guarantee it will remain so. If the parties become hostile, this child could again experience the trauma of another custody fight. Also, if the separation culminates in a final divorce, each Shepard could remarry and Judy would be confronted with another "father" and a third "mother." And the list could go on. Consequently, we hold the chancellor erred in permitting the adoption to proceed at a time when the Shepards' marital problems are unsettled and the issues arising from their marital discord are undetermined.

Accordingly, we affirm the trial court's denial of the mother's custody petition, without prejudice, of course, to her right to again seek custody of Judy when, and if, the circumstances so change that it would be in Judy's best interests to transfer her

---

* This determination disposes of a due process and equal protection constitutional argument advanced by appellees.

custody. In addition, we will set aside the interlocutory adoption order. Our mandate in the adoption case will direct the trial court to retain the proceeding on its docket pending a resolution of the Shepards' present marital controversy. We do not mean to imply the adoption may never be approved or that consideration of the adoption petition must be delayed indefinitely pending a decision by the mother to again seek a change of custody. But we do mean that until the Shepards terminate their present marital dispute, either by bona fide reconciliation or by final divorce, the trial court should proceed no further in the adoption case.

*Affirmed in part, reversed in part, and remanded.*