## CIRCUIT COURT OF HENRICO COUNTY

In re Sherry Ellen Wilkinson

Case No. A-698/SSS

By Judge E. Ballard Baker

July 31, 1979

This case is before the Court as the result of a foster care review plan filed with this Court on April 29, 1979, in which plan the Henrico County Department of Public Welfare requested the termination of parental rights of Dorsey Wilkinson, III, the father of Sherry Ellen Wilkinson, now ten years old. Evidence on that request was heard on July 23, 1979.

The case originally came to the Circuit Court on an appeal taken by the father to a Juvenile Court order of July 12, 1974, committing Sherry to the Department of Public Welfare, with permanent custody for the purpose of adoption. That appeal was heard on December 9, 1974, as a result of which the custody of Sherry was placed with the Welfare Department "with leave to said Board or to Dorsey Wilkinson, III, to have the matter reinstated on the docket of this Court at any time in the future for consideration for commitment for adoption or for change in custody."

Subsequent to, and in accord with, the revision of the Juvenile Law in 1977, the Welfare Department filed a foster care review plan on April 28, 1978. (Va. Code § 16.1-282.) This plan set a goal of return of Sherry to her father by April 28, 1979, with a statement of certain objectives relating to that goal. The father was sent a copy of that plan. On April 29, 1979, the foster care review plan was again filed, this setting adoption as the goal by April 27, 1980. Pursuant to that plan, the case was set for hearing for consideration of the termination of the residual parental rights of Dorsey Wilkinson, III, the father, with notices being served on him and those required under Va. Code § 16.1-282(C).

The parental rights of the mother were terminated previously and there is no issue on that point.

Section 16.1-283 sets up procedures to follow and standards to be met in cases involving termination of parental rights. This statute is a part of

the 1977 Juvenile Law revision and thus is after the first hearing on this matter in 1974. Prior to the 1977 Juvenile Law, it would seem that this case would be resolved in accord with the rules laid down in non-parent against parent cases in adoption and custody matters. See *Malpass v. Morgan*, 213 Va. 393, 399 (1972), and *Watson v. Shepard*, 217 Va. 538 (1976), and the later adoption case of *Ward v. Faw*, 219 Va. 1120 (1979), decided by the Supreme Court of Virginia on April 20, 1979. Those custody and adoption cases hold that the best interests of the child is not the sole criteria in parent-nonparent disputes, but it must also be shown that the parent is unfit or has lost his right in some prior proceeding.

The provisions of § 16.1-283 vary to some extent from the rules laid down in *Malpass* and *Watson*. However, I am not aware of any limitation on the General Assembly to adopt reasonable provisions for foster care children which may vary from rules laid down by the Supreme Court in other child custody cases. So, I conclude that this case must be decided under § 16.1-283, but the views of the Supreme Court lead me to believe that § 16.1-283 must be construed with full consideration of the basic right of a parent.

In this case, Sherry Ellen was committed to the Department of Public Welfare on July 12, 1974, at a time when Dorsey Wilkinson, III, was incarcerated at the State Farm. The child was removed from the home the mother was maintaining. At the time of the December 1974 hearing, the father was still confined, though on a work release basis. (The mother's rights were terminated some time ago and are not in issue here.)

The Welfare Department cites subsection C in support of its position. This permits termination of parental rights if in the best interests of the child and if the parent, without good cause, fails to maintain contact with the child and fails to substantially plan for the future of the child. There is also a provision permitting termination if the parent fails to remedy the condition which led to the foster care placement. The condition which led to foster care placement here was the neglect of the child by the mother at a time when the father was not in the home.

The problem here is that Sherry is presently adoptable but as she gets older opportunities diminish; however, Dorsey Wilkinson either will not or cannot provide a plan for Sherry under which the Welfare Department would approve the return of Sherry to him. Mr. Wilkinson was advised in a meeting on October 17, 1978, and by letter of December 12, 1978, of what the Welfare Department felt was necessary, and has not done those things.

There is, however, a relationship between Sherry and her father and the parental grandparents which makes me feel that termination of parental rights should not be done without further consideration of the alternatives.

Without at this time deciding whether the provisions of § 16.1-283(C) have been met, this Court is going to continue this case until November 13, 1979, at 1:30 P.M. At that time, Mr. Wilkinson can present evidence with respect to how he would care for and provide for Sherry if she was returned to him. This includes specifics relating to financial ability and child care.

This Court will also be interested in a psychological evaluation of Mr. Wilkinson. In view of the past history, I think this is essential. The suggestion relating to the psychological examination in the December 12, 1978, letter must be carried out by Mr. Wilkinson.

The case will be considered as continued from July 23, 1979, to November 13, 1979, at 1:30 p.m. in accord with this letter and without the service of any further notice to Mr. Wilkinson.

### November 19, 1979

In accord with my letter of July 31, 1979, which followed a full hearing on July 23, 1979, further evidence was heard on November 13, 1979.

In my July 31, 1979, letter, Mr. Wilkinson was requested to present evidence with respect to how he would care for and provide for Sherry if she was returned to him, with specifics relating to financial ability and child care. He was also requested to have a psychological examination, which was done on September 13, 1979, and the report made available to me on November 16.

Sherry will be eleven years old in February 1980. She has been in foster care for several years. Dorsey Wilkinson was confined at the State Farm when Sherry was taken from the home and placed with the Welfare Department in 1973.

On July 12, 1974, the Juvenile Court ordered Sherry to be placed in the custody of the Welfare Department for the purpose of adoption. Dorsey Wilkinson appealed.

On December 9, 1974, this Court heard the appeal, and refused to allow custody for purposes of adoption, but did leave Sherry in the custody of the Welfare Department "with leave to the said Board or to Dorsey Wilkinson, III, to have the matter reinstated on the docket of this Court at any time in the future for consideration for commitment for adoption or for change in custody." Mr. Wilkinson was at that time at a pre-release

center on work release, but hoped to be discharged in 1975. He was released in 1975.

On July 23, 1979, this Court heard evidence on the Welfare Department's request for the termination of parental rights. It appeared at that hearing that the Welfare Department in May 1978 began discussions with Mr. Wilkinson about the return of Sherry to his custody. It was pointed out in May 1978 that he should obtain employment sufficient to support Sherry, and make plans for her supervision and care. He was also asked to contribute to her support, which he refused to do, and obtain a psychological examination which he had not done by July 23, 1979. The testimony at the July 23, 1979, hearing revealed that visitation with Sherry had been minimal. It appears that Mr. Wilkinson would see Sherry every three months or so when she would visit her paternal grandparents.

Since the July hearing it appears that Mr. Wilkinson has not had visitation with Sherry though he did visit with her several times in the hospital. He says he has been waiting to see what would happen with his work efforts and the psychological examination which he obtained on September 13, 1979. Mr. Wilkinson stated that he had two part time jobs, with his income varying from $200.00 to $300.00 each month, and he had applied for work in the CETA Program. His plan for supervision of Sherry was that she would be at school in the daytime and he would be with her when she was out of school. The wife of his younger brother and Mr. Wilkinson's parents would be available as sitters. (The evidence is that Sherry would like to live with Mr. Wilkinson's parents, and this would be a good placement, but they are unable to accept custody.) The physical condition of the home where Mr. Wilkinson lives alone is adequate.

It also appears that Sherry has had an operation since July 23, this being major surgery which will cause psychological problems as she grows older.

The Welfare Department is proceeding under § 16.1-283(C), which was not in existence in December 1973 when Sherry's situation first came before the Juvenile Court, on a petition alleging "she is without proper care and supervision." (This was at a time when Mr. Wilkinson was at the State Farm, and the lack of care was chargeable to Mrs. Wilkinson alone.) Section 16.1-283(C) is applicable to a child found to be neglected, as Sherry was in December 1973. It can also be argued that Mr. Wilkinson's failure to make any contribution to her support over the past several years and his lack of effort to have her returned to his home is neglect.

This section permits the termination of parental rights if it be shown by clear and convincing evidence:

1. That it is in the best interests of the child, and

2. The parent has "failed to maintain contact with and to provide or substantially plan for the future of the child for a period of twelve months after the child's placement in foster care . . . ."

Sherry is almost eleven years old and is an attractive young girl. She is presently adoptable. A child psychologist, Dr. Haun, testified she was a bit head strong and manipulative, needing someone to give her guidance. Strict supervision is needed. In addition, the recent operation will, as noted, cause psychological problems. As between an adoptive placement and living with her father, I am convinced that her best interests are served by an adoption. Mr. Wilkinson does not appear to be the proper person to have the responsibility for the care and supervision of Sherry. This finding is based on his failure to exercise any meaningful visitation at any time, on his failure to make any specific plans for her supervision and care if custody was returned to him, on his failure or inability to obtain employment which would enable him to care for her, on his refusal to make any payment for her expenses over the last several years, and on the fact that there is no known female figure in the home to whom Sherry could relate.

Mr. Wilkinson's contact with Sherry has been occasional only, and he has failed to provide or substantially plan for her future since the Welfare Department first approached him on this in May 1978. When given a continuance from July 1979 to November 1979 with a request that he provide specifics as to how he would care for and provide for Sherry if she was returned to him, he failed to do so.

At no time since Sherry has been with the Welfare Department has Mr. Wilkinson made any contribution to her support, though requested. At no time has he ever initiated a request with the Court for the return of Sherry.

While he does a fine job when vocalizing a desire for her return and speaks with confidence of his ability to care for her properly, his actions over the past several years are not in accord.

In my judgment, the statutory requirements of § 16.1-283(C) have been met and the parental rights of Mr. Wilkinson should be terminated and Sherry placed for adoption, unless the situation of the grandparents has changed since the July 1979 hearing to the extent that they can accept custody. The Welfare Department is requested to see if there has been any such change.