COURT OF APPEALS OF VIRGINIA


Present:   Judges Bumgardner, McClanahan and Senior Judge Coleman
Argued at Salem, Virginia


JULIA LONG AND
 TONY LONG
                                                 MEMORANDUM OPINION[*] BY
v.        Record No. 1434-03-3               JUDGE SAM W. COLEMAN III
                                                        MAY 25, 2004

JUDITH HOLT-TILLMAN


            FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
                      Joseph W. Milam, Jr., Judge

         Carol B. Gravitt (Gravitt & Gravitt, P.C., on brief), for appellants.

         Robert J. Smitherman (Janine M. Jacob; Daniel, Vaughan, Medley &
         Smitherman, P.C, on brief), for appellee.

         Lee H. Turpin, Guardian *ad litem* for the minor child.


        This appeal involves a child custody dispute between the child's natural parents and her

maternal grandmother.  The trial court awarded sole physical custody of the four-year-old child to

the grandmother, Judith Holt-Tillman, and joint legal custody to Tillman and Julia Long, the

biological mother.  In doing so, the court found that the parents had voluntarily relinquished custody

of the child to the grandmother.  Julia and Tony Long appeal the relinquishment finding and the

custody ruling.  The Longs also contend the trial court erred by refusing to admit evidence of past

incidents concerning Tillman's parenting skills.  We affirm the trial court's decision.

                                     BACKGROUND

        Julia and Tony Long are the parents of K.L., who was born in August 1999.  The Longs

have two other daughters, ages seven and two.  The Longs have been married since June 2002, but

_____

         [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

have had an ongoing relationship for more than seven years. Judith Holt-Tillman is Julia's mother and the grandmother of K.L.

Immediately after the birth of K.L., Julia and K.L. resided for several months with Tony in North Carolina. In November 1999, Julia and K.L. moved into her mother's home because Julia planned to attend nursing school in order to improve her earning potential. She planned to "get back together" with Tony after completing the nursing program. When Julia and K.L. moved in with Tillman, the Longs' oldest daughter continued to reside with Tony's parents in North Carolina. The youngest daughter was not yet born. After Julia returned to Tillman's home in 1999, K.L. has continuously resided there.

Tillman testified that, after Julia first returned home, Julia primarily took care of K.L. However, Tillman stated that, over time, Julia's reliance on Tillman for K.L.'s care increased to the point that Tillman was the child's primary caregiver. Tillman testified she performed all of the housekeeping chores and cooking during the time Julia lived with her. While Julia resided with Tillman, the two had numerous disagreements over when and where Julia could take K.L. Julia testified that Tillman refused to allow her to take K.L. to North Carolina to visit the child's father. According to Julia, she and her mother always had "a very rocky relationship." Julia testified that Tillman has never liked or approved of Tony and has always made disparaging remarks about him and his family.

In March 2000, Julia obtained an order from the Danville Juvenile and Domestic Relations District Court (JDR court) awarding her sole custody of K.L. with liberal visitation to Tony. Julia stated that she sought the order because she thought it would make "things better" while she resided with Tillman. Tony did not oppose the order. However, after entry of the order, Julia and Tillman continued to have disagreements concerning K.L., particularly regarding Tony's visitation with the child. Tony testified that he was often denied visitation with K.L. when he attempted to visit her.

During the spring of 2000, Julia and Tillman had several disagreements concerning the care of K.L., resulting in Julia's periodic absences from the home, leaving K.L. in the sole care of Tillman. According to Julia, during one of these absences Tillman refused to let her visit K.L. for a period of time.

Sometime after May 2000, Julia and Tony resumed living together. When they went to Tillman's home to get K.L. in order that she could live with them, Tillman refused to let them take K.L. Afterward, Tillman filed a complaint against Julia and Tony with Child Protective Services (CPS). At the suggestion of a social services worker, Julia and Tony agreed to allow K.L. to remain with Tillman pending the investigation of the complaint. During the CPS investigation, Julia agreed to sign a consent order which awarded joint legal custody of K.L. to Julia and Tillman but awarded sole physical custody of K.L. to Tillman. The order further provided that Julia would have visitation with K.L. one day per week for six hours and additional visitations as the parties agreed. Julia testified that she feared if she went to court she "wouldn't get [K.L.]." The consent order was entered on July 27, 2000.

Julia complied with the visitation conditions, although they made it difficult for Tony to visit K.L. In addition, Julia testified she gave Tillman her WIC (Women, Infants and Children) welfare checks to assist in paying for K.L.'s care.

As to Tillman's explanation of how the parties agreed to the joint custody arrangement, she testified that Julia had wanted to give Tillman sole custody of K.L. and that it was Tillman's idea that they have joint custody. Tillman denied that she established any limitations on Julia's visitation rights, and she stated that the visitation arrangement initially worked well.

For the fifteen months from July 2000 to November 2001, K.L. lived with Tillman and Julia visited the child one day per week. Tillman testified that in early 2001, she needed financial assistance to pay K.L.'s expenses, but, other than the WIC checks, Julia had only occasionally

provided diapers for K.L. and Tony had provided no financial support. Julia testified that she paid Tillman for some expenses for K.L.'s care.

In November 2001, Tillman filed a support petition in the JDR court and the court ordered the parents to pay Tillman child support. On November 8, 2001, the Longs filed in the JDR court a motion to amend the July 27, 2000 consent order, requesting full custody of K.L. In response, on February 11, 2002, Tillman filed in the JDR court a motion to amend the consent order, also requesting full custody of K.L. On July 11, 2002, the JDR court issued a temporary order, ruling that custody was to remain with Tillman pending a home study on Tillman. The court continued the matter until October 18, 2002 for a final hearing. By order dated October 18, 2002, the JDR court awarded "full custody" of K.L. to Tillman with visitation to the Longs. Julia appealed that decision to the circuit court.

At the February 2003 circuit court custody hearing, K.L.'s guardian *ad litem* commended the Longs for the improvements they had made in their lives and gave her opinion that the Longs were able to provide an appropriate home for K.L. However, she also opined that in the absence of the parental presumption, the child's best interests would be served by remaining in Tillman's custody.

The evidence showed that in the past the Longs have had financial difficulties. But, at the time of the hearing, Tony had worked for the same employer for four years, he is considered "an excellent" worker and had been promoted to foreman over one year ago. Julia has worked in the same convenience store for one year, and her employer considers her a reliable and hard worker. Julia testified that the couple is current on paying bills. They had been residing for approximately one year in a rented home in which they have designated a bedroom for K.L. The family has health, medical, dental, and prescription coverage through Tony's employment.

In an opinion letter dated April 23, 2003, the trial court awarded joint legal custody of K.L. to Julia and Tillman, subject to the parents having expanded visitation rights, and sole physical custody of K.L. to Tillman. The trial court held that "clear, cogent and convincing evidence" established that the Longs had voluntarily relinquished custody of K.L. to Tillman. The court found that the immediate transfer of physical custody to the Longs at that time would not be in K.L.'s best interests because K.L. enjoyed a strong relationship and a stable living environment with Tillman. In addition, the child had known no home other than that provided by her grandmother. The court described its ruling as a "transitional custody arrangement," allowing K.L. to acclimate to life with her parents, yet preserving for her a stable living environment. The trial court stated that it would revisit custody in the summer of 2004.

The Longs appeal the trial court's custody ruling.

ANALYSIS

Admission of Evidence

During the custody hearing, the Longs proffered evidence of specific instances of Tillman's child-rearing techniques that had occurred during Julia's childhood, which evidence the Longs contend was relevant to prove that Tillman possessed and exhibited poor parenting skills. The trial court refused to admit the evidence, ruling that it was remote and was irrelevant to the issue of Tillman's present ability to rear K.L.

Evidence ordinarily is admissible if it "is both material--tending to prove a matter that is properly at issue in the case--and relevant--tending to establish the proposition for which it is offered." Johnson v. Commonwealth, 2 Va. App. 598, 601, 347 S.E.2d 163, 165 (1986). Evidence concerning incidents in Julia's childhood with her mother did not tend to prove whether it was in the best interests of K.L. to remain in Tillman's physical custody--the matter at issue in the case. Ample and sufficient evidence of Tillman's parenting of K.L. since her birth had more evidentiary

- 5 -

value in proving whether Tillman was capable of parenting and rendered the proffered evidence of little or no evidentiary value. The proffered evidence of Tillman's parenting of Julia did not tend to establish that Tillman was unsuitable to raise K.L. Accordingly, the trial court did not abuse its discretion in refusing to admit it.

Custody

"[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." Troxel v. Granville, 530 U.S. 57, 65 (2000).

"In all child custody cases, including those between a parent and nonparent, 'the best interests of the child are paramount and form the lodestar for the guidance of the court in determining the dispute.'" Bailes v. Sours, 231 Va. 96, 99, 340 S.E.2d 824, 826 (1986) (quoting Walker v. Brooks, 203 Va. 417, 421, 124 S.E.2d 195, 198 (1962)). "The court shall give due regard to the primacy of the parent-child relationship but may upon a showing by clear and convincing evidence that the best interest of the child would be served thereby award custody or visitation to any other person with a legitimate interest." Code § 20-124.2(B).

In custody disputes between a natural parent and a nonparent, the law presumes the best interest of the child will be served when the child is in the custody of the natural parent. Bailes, 231 Va. at 100, 340 S.E.2d at 827. When applying the parental presumption, "the rights of the [natural] parents may not be lightly severed but are to be respected if at all consonant with the best interest of the child." Wilkerson v. Wilkerson, 214 Va. 395, 397, 200 S.E.2d 581, 583 (1973).

> To overcome the strong presumption favoring a parent, the nonparent must adduce by clear and convincing evidence that: (1) the parents are unfit; (2) a court previously has granted an order of divestiture; (3) the parents voluntarily relinquished custody; (4) the parents abandoned the child; or (5) special facts and circumstances constitute extraordinary reasons to take the child from the parents.

Mason v. Moon, 9 Va. App. 217, 220, 385 S.E.2d 242, 244 (1989).

"Because the trial court heard the evidence at an *ore tenus* hearing, its decision 'is entitled to great weight and will not be disturbed unless plainly wrong or without evidence to support it.'" Piatt v. Piatt, 27 Va. App. 426, 432, 499 S.E.2d 567, 570 (1998) (citation omitted).

Tillman contends that the Longs are not entitled to the parental presumption because they voluntarily relinquished custody of K.L. to her and that, without the parental presumption, K.L.'s best interest would be served by remaining with her. The Longs contend that because Julia always retained joint legal custody of K.L., and periodically lived in the home with K.L. and Tillman, and at all other times visited K.L. and maintained a close relationship with her, no voluntary relinquishment of the custody of K.L. occurred. Thus, they contend the trial court was required to apply the parental presumption.

The trial court held that Tillman had rebutted the parental presumption by proving that Julia voluntarily relinquished her right to custody of K.L. to Tillman. The court found that Julia participated "only intermittently" in K.L.'s early upbringing, and she voluntarily left "the primary responsibility" for K.L.'s care with Tillman. In addition, the trial court found that Tony "willingly played a limited role in [K.L.]'s early upbringing and voluntarily acquiesced to [K.L.]'s placement in [Tillman]'s custody." The trial court found that Julia and Tony offered "no appreciable financial support" for the child until the JDR court ordered them to do so. On these findings the court ruled that clear and convincing evidence proved the Longs had voluntarily relinquished custody of K.L. to Tillman.

The dispositive issue is whether the consent order granting physical custody of K.L. to Tillman was a voluntary relinquishment of custody of K.L. by Julia to Tillman, thereby rebutting the presumption favoring custody by a parent over a nonparent.

We hold that the consent order was a voluntary relinquishment of physical custody by Julia of K.L. and, thus, the parental presumption does not apply to this case. Therefore, Julia had

the burden to prove that circumstances had so changed since the voluntary relinquishment that return of K.L. to her parents would be in the child's best interests.

The Supreme Court's decision and reasoning in Watson v. Shepard, 217 Va. 538, 544-45, 229 S.E.2d 897, 901 (1976), controls our decision here. Watson involved a custody dispute between a natural mother and paternal relatives who were seeking to adopt the child. In Watson, the mother had executed a notarized statement which stated, "'I give my consent for [the Shepards] to have custody of [my] daughter . . . .'" The mother, who was separated from the child's father, gave custody of the child to the Shepards because she felt she was financially unable to take care of the child and she believed her daughter was "'better off'" with the Shepards until she "'could get [her]self straightened out.'" Id. at 539-40, 229 S.E.2d at 898. Based on the mother's having relinquished custody of her child until she could care for the child, the JDR court entered an order granting the Shepards custody.

Several years later, the mother petitioned the trial court for custody of her daughter. The trial court denied the change of custody petition, and the mother appealed.[1] The Supreme Court ruled that the JDR court order giving custody of the child to the Shepards

> was not merely *pro forma* . . . but it was based upon [the mother's] voluntary relinquishment of custody, as evidenced by a written statement executed by [the mother], upon results of a thorough investigation, and upon a hearing by a court of competent jurisdiction . . . . Consequently, the mother's parental custody rights were altered and for her to be entitled to a later change in custody, the burden was upon her to show the circumstances had so changed since entry of the foregoing order that it would be in [the child]'s best interests to transfer custody to her; the burden was not upon the Shepards, as the mother argues, to show parental unfitness.

Id. at 545, 229 S.E.2d at 901.

---

[1] The Watson case also involved an appeal of an interlocutory adoption order, but that issue is not germane to this case.

Here, Julia agreed in the consent order to voluntarily relinquish physical custody of K.L. to Tillman while retaining joint legal custody. As in the Watson case, the relinquishment was on a temporary basis until the parents could make the changes in their lives that might enable them to resume custody. "A voluntary relinquishment occurs when a parent willingly agrees or consents to having their child placed in the custody of a nonparent." Mason, 9 Va. App. at 222, 385 S.E.2d at 245. The JDR custody order granting Tillman sole physical custody of K.L., even though ultimately a consent order, was not "merely *pro forma*," but was an adjudication on the merits by the court in a proceeding where both parties were contesting custody. The JDR court decision was based upon evidence presented at a custody hearing and from a CPS investigation. Moreover, the JDR court order went beyond merely preserving the *status quo*. Cf. Wilkerson, 214 Va. at 397, 200 S.E.2d at 583 (finding agreed order had "neither the dignity nor the effect of a final order of custody upon the merits" where, upon parents' agreement, JDR court ordered continuing temporary custody of child with nonparent to maintain the *status quo* during pendency of the parents' divorce proceeding).

This case is distinguishable from Ferris v. Underwood, 3 Va. App. 25, 348 S.E.2d 18 (1986), upon which the Longs rely. First, Ferris dealt with whether the court's order constituted an order of divestiture where there had been only an agreed order and no adjudication by the court, and here we decide whether as a matter of fact the parent had voluntarily relinquished custody of the child to a nonparent. In Ferris, we held that where an "agreed temporary custody order" had been entered without an adjudication awarding custody to a grandparent "such order ha[d] 'neither the dignity nor the effect of a final order of custody upon the merits' [and] . . . the parental presumption is applicable." Id. at 28, 348 S.E.2d at 20.

However, the JDR court custody order awarding custody of K.L. to Tillman

> was a determination by a court of competent jurisdiction of the custody question on its merits based upon then-existing facts. . . .

- 9 -

> Consequently, [Julia] . . . , when [s]he instituted the present proceeding, was not clothed with the parental presumption generally accorded natural parents in a dispute with non-parents, because h[er] parental custody rights were altered by the [JDR court] order. [T]herefore, . . . in this proceeding the welfare of [K.L.] is the paramount consideration, and . . . the burden was upon [Julia] to prove that circumstances had so changed since the [JDR court] order that it would be in [K.L.]'s best interests to transfer custody to h[er and Tony].

McEntire v. Redfearn, 217 Va. 313, 315-16, 227 S.E.2d 741, 743 (1976).

After ruling that the parental presumption did not apply, the trial court found that the Longs had not proven that an "immediate transfer" of physical custody would serve K.L.'s best interests "at this time," noting that the four-year-old child had known no other home than the one provided by Tillman. The trial court also found that K.L. enjoyed a "strong relationship and a stable living environment" with her grandmother. Thus, the trial court found that K.L.'s best interests would be served by adopting a "transitional custody arrangement, a middle ground" that acclimates K.L. to life with her natural parents while preserving a stable living environment. Accordingly, the court held that Tillman and Julia would share legal custody and Tillman would retain physical custody of K.L. until further review of the case in the summer of 2004.

We find that the trial court did not abuse its discretion by not returning K.L. to the Longs at the time. The evidence shows that the custody arrangement was considered by the parties and by the trial court as temporary custody, with return of the child to the mother or both parents if and when they demonstrated that they are suitable and responsible parents. Indeed, deficiencies in the Longs' ability to parent the child existed when K.L. was first born and the parents were unmarried and were starting their lives together as young adults. The Longs experienced financial difficulties in the past, but they appear to be in the process of establishing a stable living situation. They are both employed and have received positive assessments from their employers. The Longs rent a home where they reside with their youngest daughter and have

visitation with their oldest daughter, K.L.'s biological siblings.  The home study revealed that the youngest daughter is "thriving and appears to be on target in growth and development" while residing with the Longs.  The home study did not reveal "evidence to suspect that [the Longs] are incapable of providing a safe and secure home for [K.L.]."  The Longs have always had a role in K.L.'s life and are most certainly not strangers in her life.

> Although each dispute concerning custody and visitation presents unique circumstances . . . the trial court's judgment in every case is guided by a single, unvarying standard that the welfare of the child is the primary, paramount, and controlling consideration of the court.  All other matters are subordinate.  The trial court's decision whether it was to the best interest of [K.L.] was within its discretion and is reversible only upon a showing that the court abused its discretion.

Brown v. Burch, 30 Va. App. 670, 689, 519 S.E.2d 403, 412 (1999) (citation omitted).

It appears that the Longs are devoted to K.L. and are making concerted efforts to stabilize their family life and to be able to give K.L. proper care.  Although they have taken steps toward this end, the trial court found that the evidence failed to show that K.L.'s best interests would be served at the time by a return of custody to them.  Under the court's ruling Julia continues to share joint legal custody of K.L. with Tillman, meaning she will have "joint responsibility for the care and control of [K.L.] and joint authority to make decisions concerning [K.L.]."  Code § 20-124.1 (defining joint custody).  The trial court did not abuse its discretion in refusing to return physical custody to the Longs at the time.

Accordingly, we affirm the judgment of the trial court.

Affirmed.