## Richmond

### JOSIE ESTER ROCKA, ETC. v. ROANOKE COUNTY DEPARTMENT OF PUBLIC WELFARE.

January 20, 1975.

Record No. 740235.

Present, All the Justices.

*Burton L. Albert,* for plaintiff in error.

*John N. Lampros, Commonwealth's Attorney for Roanoke County,* for defendant in error.

Poff, J., delivered the opinion of the court.

On March 1, 1972, the Juvenile and Domestic Relations Court of Roanoke County (the juvenile court), upon petition filed December 30, 1971, by the Roanoke County Board of Public Welfare (the Board), entered orders granting the Board temporary custody of two infant children, then aged six and four years, of Raymond George Chillson, Sr., (the father) and Josie Ester Rocka, also known as Nikki Chillson (the mother). On October 4, 1972, the juvenile court granted the Board's petitions for permanent custody with the right to place for adoption. On the mother's appeal, the circuit court entered orders on November 17, 1972, remanding the cases on the ground that the father had not been notified of the custody hearing. Further proceedings were delayed for nearly a year pending the Board's

efforts to acquire background information concerning the fitness of the father. On October 11, 1973, rejecting the claims of both the father and the mother, the juvenile court granted permanent custody to the Board. On November 15, 1973, upon a hearing *de novo*, the circuit court found that granting permanent custody to the Board "would be to the benefit and welfare of said children" and on that finding entered a final order. We granted the mother a writ of error; the father did not seek a writ.

The mother contends that the final order "is contrary to the law and evidence" and that the evidence is insufficient to show that she "is either unfit or unable to care for the children."

The evidence consists solely of certain departmental records and the testimony of the mother and that of a caseworker. About 1965, the mother and father began living together as man and wife in Florida.[1] At that time, the mother was approximately 19 years old and the father was 16 years her senior. Three children were born of their union. The mother was described by her Florida relatives as "a good natured kid, decent, easily influenced, irresponsible and immature". The father, a migrant farm worker, physically abused the mother and their three children. In December, 1971, fearing for their safety, the mother fled from her Florida home and took their children in the family pickup truck to her brother's home near Farmville, Virginia. Expelled from the house by her brother's wife, the mother took the children to Roanoke. Having no place to stay and only $33.00 in cash, she sought and received temporary shelter and other assistance from a local church. On December 30, 1971, she asked the Board to take the children and place them in foster care until she could find work and a place to live.

Soon thereafter, she found work for short periods of time in a restaurant and in an aluminum products company in Roanoke. She rented a room at a motel and bought her own funiture to replace what was there. The caseworker testified that the mother "felt that it would be easier for her to provide a home for two of the children than it would be for three" and, pursuant to the Board's recommendation, granted formal consent to place the youngest child for adoption. That adoption, fully consummated, is not in issue here.

---

[1] Under Florida law, common law marriages consummated before January 1, 1968, are valid. FLA. STAT. ANN. § 741.211. (West 1964, Supp. 1974).

Early in 1972, the mother went to Richmond in search of employment. Some time later, she returned to Roanoke and, for a period of approximately two months, worked as driver for a taxicab company. In July, 1972, she went to North Carolina to work in the tobacco fields. In October, 1972, learning that the Juvenile Court had entered permanent custody orders, she returned to Roanoke and filed an appeal. Thereafter, and during the year when the Board was assembling information concerning the fitness of the father, the record shows nothing about the mother's employment history except that she worked for a time at a concrete plant in Atlanta, Georgia. At the time of the *de novo* hearing, she was working again for the taxicab company in Roanoke. Because the mother and children were not living in the same household, they were ineligible for benefits under the Aid to Dependent Children program. During the entire period, she made regular rental payments on the motel room. On the day before the hearing, she signed a one-year lease on a two-bedroom apartment.

Before the juvenile court entered the first permanent custody orders, the mother visited her children four times. She asked to see them more often but was told that "the children had to get adjusted to their new situation." Thereafter, the caseworker testified that in response to requests relayed through the mother's attorney "we denied the visits upon the basis that the children were permanently committed to the Welfare Department." The caseworker further testified that "I don't doubt her sincerity in wanting the children, or that she loves the children in her way, but what I do doubt is her capacity to provide a stable home for the children" and "we felt that it would be in the best interest of the children to place them for adoption."

"We have established the rule in Virginia that in custody and adoption cases the welfare of the child is of paramount concern and takes precedence over the rights of parents. [Citations omitted]. There is, however, a condition to the rule in custody cases where the contest is between parent and non-parent, and we believe the condition should apply equally in adoption cases. The condition is that the rights of parents may not be lightly severed but are to be respected if at all consonant with the best interests of the child. [Citations

omitted]." *Malpass* v. *Morgan*, 213 Va. 393, 399-400, 192 S.E.2d 794, 799 (1972).

"The general rule that the welfare or interest of the child is of paramount consideration in determining the question of custody has its most accepted application in the settlement of the rival claims of parents and is subject to the condition that a fit parent with a suitable home has a right to the custody of his child superior to the rights of others. Here the law presumes that the child's best interest will be served when in the custody of its parent. [Citations omitted].

"The burden of showing the existence of circumstances which would deprive the father of the right to custody of his son is upon the parties opposing this right. [Citation omitted]. And such evidence of unfitness must be cogent and convincing. [Citations omitted]." *Judd* v. *Van Horn*, 195 Va. 988, 995-96, 81 S.E.2d 432, 436 (1954); quoted with approval, *Wilkerson* v. *Wilkerson*, 214 Va. 395, 397, 200 S.E.2d 581 (1973).

■ Here, the circuit court made no finding of parental unfitness. Its permanent custody order was based upon a finding that such custody "would be to the benefit and welfare of said children." On appeal, the Board would have us treat that finding as equivalent to a finding that the mother is an unfit parent. We hold it is not. Many of the interests of any child of any parent of modest means might be better served in the custody of a more affluent foster parent, but that does not mean that the natural parent is unfit for custody. The rule of comparative best interests applied in child custody contests between parents is inapposite to contests between parent and non-parent. The general rule is that the parent prevails unless the non-parent bears the burden of proving, by clear and convincing evidence, both that the parent is unfit and that the best interest of the child will be promoted by granting custody to the non-parent. *Wilkerson* v. *Wilkerson, supra*, 214 Va. at 397-98, 200 S.E.2d at 583. Here, the circuit court applied the wrong rule, and its custody order is, therefore, contrary to law.

■ We believe that the evidence of parental unfitness in this record is less than clear and convincing and, thus, insufficient to divest a parent of custody of its child. It would serve no useful purpose at this point to require a new evidentiary hearing to

determine whether the mother was a fit parent more than a year ago; the evidence has grown stale. So far as both the childrens' welfare and the mother's rights and obligations are concerned, what is relevant is the mother's fitness now. For more than two years while custody orders have been outstanding against the mother, she has had no access to her children and no opportunity to demonstrate her capacity to care for them in a suitable home. If the mother and children are reunited in the same household and the family unit is otherwise qualified, it will become eligible for benefits under the Aid to Dependent Children program. We believe that the mother is entitled to an opportunity to demonstrate that, with the assistance the law provides, she can succeed.

Accordingly, the judgment is reversed and the case is remanded to the circuit court with instructions to remand to the juvenile court. Upon remand, the juvenile court will enter an interlocutory order awarding custody to the mother for a period of six months, or for such longer period as may be determined. If, within that period, the Board files a petition and produces clear and convincing evidence of parental unfitness, the juvenile court will enter a final order vacating the interlocutory order and granting custody to the Board with the right to place for adoption. If the Board files no such petition, the interlocutory order will become final. If the Board files such petition but fails to produce such evidence, the juvenile court will enter a final order granting custody to the mother.

*Reversed and remanded.*