### Richmond

### DOROTHY TWEEDY KNOX

### V.

### LYNCHBURG DIVISION OF SOCIAL SERVICES

March 12, 1982.

Record No. 801789.

Present: Carrico, C.J., Cochran, Compton, Thompson, and Stephenson, JJ., and Harrison, Retired Justice.

214

Peter O. Ward, Jr., for appellant.

Walter C. Erwin, III, Assistant City Attorney, Frank West Morrison, Guardian ad litem (Bell, Coward, Morrison & Spies, on briefs), for appellee.

Amicus Curiae: Commonwealth of Virginia, Department of Welfare. (Marshall Coleman, Attorney General; Jane D. Hickey, Special Assistant Attorney General; John A. Rupp, Assistant Attorney General, on brief), for appellee.

Amicus Curiae: Youth Advocacy Clinic, T. C. Williams School of Law, University of Richmond. (Robert E. Shepherd, Jr., on brief), for appellee.

CARRICO, C.J., delivered the opinion of the Court.

In this case, the trial court terminated the residual parental rights of the mother of three minor children. The principal question presented stems from our 1975 decision in *Rocka* v. *Roanoke Co. Dep't of Welfare,* 215 Va. 515, 211 S.E.2d 76, and the General Assembly's 1977 enactment of Code § 16.1-283.[1] Specifically, the question is whether § 16.1-283 modifies the *Rocka* rule that,

---

[1] **§ 16.1-283. Termination of residual parental rights.**—A. The residual parental rights of a parent or parents may be terminated by the court as hereinafter provided in a separate proceeding if the petition specifically requests such relief. No petition seeking termination of residual parental rights shall be accepted by the court prior to the filing of a foster care plan, pursuant to § 16.1-281, which documents termination of residual parental rights as being in the best interests of the child. The court may terminate the residual parental rights of one parent without affecting the rights of the other parent. Any order terminating residual parental rights shall be accompanied by an order continuing or granting custody to a local board of public welfare or social services, to a licensed child-placing agency or the granting of custody or guardianship to a relative or other interested individual. An order continuing or granting custody to a local board of public welfare or social services or to a licensed child-placing agency shall indicate whether that board or agency shall have the authority to place the child for adoption and consent thereto. The summons shall be served upon the parent or parents and the other parties specified in § 16.1-263. Written notice of the hearing shall also be provided to the foster parents of the child if they have had physical custody of the child for more than twelve months informing them that they may appear as witnesses at the hearing to give testimony and, within the discretion of the court, otherwise participate in the proceeding. The summons or notice of hearing shall clearly state the consequences of a termination of residual parental rights. Service shall be made pursuant to § 16.1-264.

B. The residual parental rights of a parent or parents of a child found by the court to be neglected or abused and placed in foster care as a result of (i) court commitment, (ii) an entrustment agreement entered into by the parent or parents or (iii) other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

1. The neglect or abuse suffered by such child presented a serious and substantial threat to his or her life, health or development; and

2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his or her parent or parents within a reasonable period of time.

Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subparagraph B 2 hereof:

a. The parent or parents are suffering from a mental or emotional illness or mental deficiency of such severity that there is no reasonable expectation that such parent will be able to undertake responsibility for the care needed by the child in accordance with his or her age and stage of development;

b. The parent or parents have habitually abused or are addicted to intoxicating liquors, narcotics or other dangerous drugs to the extent that proper parental ability has been seriously impaired and the parent, without good cause, has not responded

in a contest between a parent and a social service agency, the

to or followed through with recommended and available treatment which could have improved the capacity for adequate parental functioning; or

c. The parent or parents, without good cause, have not responded to or followed through with appropriate, available and reasonable rehabilitative efforts on the part of social, medical, mental health or other rehabilitative agencies designed to reduce, eliminate or prevent the neglect or abuse of the child.

C. The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent or parents or other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

1. The parent or parents have, without good cause, failed to maintain contact with and to provide or substantially plan for the future of the child for a period of twelve months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent or parents and to strengthen the parent-child relationship; or

2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subparagraphs C 1 or 2 hereof:

a. The parent or parents have failed, without good cause, to communicate on a continuing or planned basis with the child for a period of twelve months; or

b. The parent or parents, without good cause, have failed or have been unable to make reasonable progress towards the elimination of the conditions which led to the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a social, medical, mental health or other rehabilitative agency.

D. The residual parental rights of a parent or parents of a child found by the court to be neglected or abused upon the ground of abandonment may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

1. The child was abandoned under such circumstances that the identity of the parent or parents cannot be determined; and

2. The child's parent or parents, guardian or relatives have not come forward to identify such child and claim a relationship to the child within six months following the issuance of an order by the court placing the child in foster care; and

3. Diligent efforts have been made to locate the child's parent or parents without avail.

E. Notwithstanding any other provisions of this section, residual parental rights shall not be terminated if it is established that the child, if he or she be fourteen years of age or older or otherwise of an age of discretion as determined by the court, objects to such termination.

court may not terminate the rights of the parent absent an express finding of parental unfitness.[2]

The present case involves a girl, born April 14, 1973, and twin boys, born August 24, 1974. Their parents, Dorothy Tweedy Knox and Robert P. Knox, were married in May, 1972.

On January 2, 1975, the father was arrested, and the mother placed the children with Christine Beasley, a family friend who operated a foster care home. At the time, the twins were in "very bad" physical condition. On January 24, the father and mother signed agreements entrusting the children temporarily to the Lynchburg Division of Social Services.

The Beasley home was not an approved foster care facility. However, the Division gave it special approval so the children could remain there, near their parents' residence.

In February, 1975, the father was sentenced to serve five years in the Virginia penitentiary. During the next year, the mother changed jobs and residences often. Her contacts with the Division were "sporadic" until May, 1977, when they became frequent. In the meantime, the Division was awarded temporary custody of the three children.

In September, 1977, the father was released from prison. He and the mother acquired a place to live, visited the children in the Beasley home, and made plans for the children's return. In December, however, the parents separated. Thereafter, they appeared in court for "fighting" and were "ordered to stay away from each other."

In the early months of 1978, based in part on the mother's complaints, the Division became concerned about conditions in the Beasley home. In an effort to prepare for the children's return to the mother, the Division had her sign an agreement dated June 2, 1978, which required her to maintain regular contact with her social worker, to visit the children every two weeks, to obtain suitable housing, and to establish financial stability. The agreement stated further that a social worker would counsel the mother regarding sources of employment and housing, provide transportation in seeking work and living quarters, and arrange visits with the children.

---

[2] We reaffirmed the *Rocka* rule in *Berrien* v. *Greene County,* 216 Va. 241, 217 S.E.2d 854 (1975).

At the end of June, 1978, the Division removed the mother's social worker and did not designate a new worker until August. When the new worker was assigned, she arranged to transfer the children from the Beasley home to a foster home in Bedford County, "over twenty miles away." The change upset the mother because she lacked "ready transportation" to visit the children.

From September until the end of December, 1978, the Division experienced "significant differences and difficulties" with the mother concerning "visits, finances, living quarters and related matters." In January, 1979, both the mother and the father discussed with the social worker the children's situation. The father indicated his desire to "give up" the children, but said he was willing for the mother to assume their responsibility. The mother stated she wanted "to get the children back," but she refused to sign a revised agreement covering "financial and other arrangements" the Division considered necessary for the mother to regain custody.

The conflict between the mother and the Division continued, accentuated by the mother's failure to return the children to their foster home following an Easter visit. In addition, the mother lost her job at a nursing home and was unable to find fulltime employment.

The Knox's divorce became final in April, 1979. On May 10, 1979, the father executed an agreement entrusting the children to the Division permanently and authorizing their placement for adoption. When the Division requested the mother to sign a similar agreement, she refused. Later, the Division filed petitions in juvenile and domestic relations district court, seeking termination of parental rights and permission for adoption placement. The petitions were granted, and the mother appealed to the circuit court.

After a hearing on December 13, 1979, the circuit court continued the matter to give the mother an opportunity, with the assistance of a new social worker, to "show progress in her financial and living arrangements." When the case returned to court on April 7, 1980, it was continued again to permit the mother to pursue the employment plan worked out by her social worker and "to see if further progress in her overall situation could be made." At a hearing on July 7, 1980, it appeared that the mother "had not pursued the plan" and that her overall situation had not improved.

The circuit court entered orders reciting that termination of parental rights was in the children's best interests and that the

mother "without good cause, [had] been unwilling and unable, within a period in excess of five (5) years, to remedy substantially the conditions which led to [the children's] foster care placement, notwithstanding reasonable and appropriate efforts of social, employment, mental health and other rehabilitative agencies to such end." The orders terminated the mother's rights and authorized the Division to place the children for adoption.

As indicated earlier, the principal question for decision is whether the 1977 enactment of Code § 16.1-283 modified the *Rocka-Berrien* rule that, in a contest between a parent and a social service agency, the rights of the parent may not be terminated absent a specific finding of unfitness.[3] The mother contends that a specific finding of unfitness is still required and that, because the trial court made no such finding, it erred in terminating her parental rights.

We disagree with the mother. *Rocka* and *Berrien* were decided under Code § 16.1-178, which permitted severance of parental rights if it was "for the child's best interest and that of the State that such child be separated permanently from its parent, parents or guardian." In *Rocka,* we held that a trial court's finding that an award of permanent custody to a social service agency would promote the child's best interests was not equivalent to a finding of parental unfitness. *Berrien* reaffirmed that holding. In both cases, we said that before a court could terminate parental rights, it must find not only the child's best interests would be served but also that the parent was unfit.

In apparent response to the *Rocka* and *Berrien* decisions, the General Assembly repealed § 16.1-178 and replaced it with § 16.1-283. Now, by statute, the court is required to find both that the termination of parental rights will promote the best interests of the child and that certain factors listed in the statute are present. Once the court finds these factors are present, it need not make a further finding of parental unfitness. In our opinion, a finding that the factors exist is tantamount to a finding of parental unfitness.

The mother contends next that the trial court's decision "is not supported by sufficient evidence of facts required by Code

---

[3] *Weaver* v. *Roanoke Dept. of Human Res.,* 220 Va. 921, 265 S.E.2d 692 (1980), was decided after the enactment of § 16.1-283. However, we reserved decision on the question whether the new Code section "removes the requirements set forth in *Rocka.*" 220 Va. at 928, n. 5, 265 S.E.2d at 696, n. 5.

§ 16.1-283(C)(2) in order to terminate [her] parental rights and place her children for adoption." Subsection (C)(2) permits termination of parental rights if the "parent or parents, without good cause, have been unwilling or unable within a reasonable period to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end."

The mother concedes that when the Division assumed responsibility for her children in January, 1975, her "situation was grim"; she had meager financial resources and her husband faced a possible prison term. Nevertheless, the mother says, she persisted in her efforts to provide for her children despite the hardships she faced; she sought employment, she placed the children in the Beasley home, she visited them regularly, and she agreed to the Division's terms for the return of the children to her custody.

The mother claims that the Division thwarted her efforts to establish her ability to resume care of the children. The "first thing that happened," she asserts, was the removal of her social worker in June, 1978, and the failure of the Division to appoint a replacement for two months. The record shows, however, that "the social worker supervisor" handled the mother's case during the two-month period and was available for the mother's consultation.

The "next significant development," the mother says, was the transfer of the children from the Beasley home to a foster home in Bedford County, "over twenty miles away." The mother insists that the transfer and an unsympathetic social worker made it difficult to arrange visits with the children. But the Bedford location was chosen because it was "the nearest approved and available foster home." Furthermore, the Division was willing to provide the mother with transportation to visit the children at the Bedford home, and it never refused a request by the mother for visitation; indeed, the Division tried to schedule visits for the mother, but the effort was unsuccessful because she failed to give the Division any "concrete dates."

Then, the mother states, there began a deterioration of her relationship with the Division that culminated in the filing of the petitions to terminate parental rights. The mother charges that "[d]eception and recrimination characterized the Division's actions in working out the permanent separation of the children

from [the mother]." We find nothing in the record, however, to support this charge, and we dismiss it as wholly lacking in merit.

Finally, the mother alleges that the Division made "little or no efforts" to provide the range of services and assistance required by Code § 16.1-283(C)(2). Only after the case reached circuit court, the mother asserts, were any services furnished her, and then only at the direction of the court. She responded to the court's action in "limited fashion," the mother says, by persisting in her search for work and suitable living quarters, but her endeavors apparently were "too little [and] too late."

We do not believe, however, that the record supports these allegations. We think the record shows clearly that the Division met often with the mother and counseled her concerning her needs and problems, advised her of the social and rehabilitative services available to assist her, and offered to provide her with transportation to obtain those services. Of particular significance is the evidence concerning the seven-month period from December 13, 1979, to July 7, 1980, during which the trial court held the case in abeyance for the Division to work with the mother to improve her situation. In this period, the mother was offered vocational rehabilitation and job training programs, assistance in job placement, training in a "sheltered workshop" program, testing, evaluation, and counseling in a mental health clinic, and classes in parenthood training. For these purposes, the Division scheduled appointments for the mother, reminded her of the appointments, and offered to provide her with transportation. Yet, the mother refused to accept many of the services offered her, failed to keep a number of the appointments, and rejected the Division's offer of transportation. More important, the mother exhibited little ability or willingness to improve the situation that existed when the Division first assumed responsibility for the children.

The mother contends, however, that the trial court erred in taking into account the events occurring in this seven-month period. The court should have confined its consideration of the evidence, the mother maintains, to the time preceding the filing of the petitions in juvenile court. She was already in "poisoned waters" as a result of the filing of the petitions, the mother complains, and, in any event, seven months is "too short a time to expect rehabilitation."

We do not agree that it was improper for the trial court to consider the events occurring in the seven-month period. Rather, we

believe it was within that court's sound discretion to continue the case to allow further services by the Division and to evaluate the mother's progress during this period in determining whether to terminate her parental rights.

 We are of opinion that the trial court's decision to terminate the mother's residual parental rights is supported by clear and convincing evidence showing both that the termination is in the best interests of the children and that the factors required by Code § 16.1-283(C)(2) are present. This brings us to the mother's final contention, *viz.,* that, even though the decision may be "in accord" with § 16.1-283, the statute itself is unconstitutional because it permits termination of parental rights in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States and Article I, §§ 1 and 11 of the Virginia Constitution.

The mother argues that her rights to her children are fundamental and can be altered only for compelling cause. The mother asserts that § 16.1-283 violates this principle and is invalid because (1) it denies substantive due process by permitting termination in the absence of a compelling state interest, (2) it is unconstitutionally vague, and (3) it permits termination of parental rights on proof by a mere preponderance of evidence.

We do not agree with the mother. Clearly, the protection of children from harm, whether moral, emotional, mental, or physical, is a valid and compelling state interest. *Stanley v. Illinois,* 405 U.S. 645, 652 (1972). Section 16.1-283 plainly is designed to implement that interest. And the section contemplates the use, where possible, of alternatives less drastic than termination of parental rights. For example, subsection (C)(2), with which we are concerned here, applies only where a child previously has been placed in foster care and the parent, without good cause and after receiving the assistance of social and rehabilitative agencies, has been unable or unwilling to correct the conditions that led to foster care in the first place.

Further, we believe that § 16.1-283 contains clear and specific guidelines for its application in particular cases. And, finally, a finding that the § 16.1-283 factors exist, which, as we have seen, is tantamount to a finding of parental unfitness, must be supported by clear and convincing evidence. Hence, § 16.1-283 survives the mother's constitutional attack.

For the reasons assigned, we will affirm the judgments of the trial court terminating the residual parental rights of the mother to the three children involved in this proceeding.

*Affirmed.*