288 S.E.2d 410 (1982)
Lorene P. HARRIS
v.
LYNCHBURG DIVISION OF SOCIAL SERVICES.
Eli WOODSON
v.
LYNCHBURG DIVISION OF SOCIAL SERVICES.
Record Nos. 802043, 802047.
Supreme Court of Virginia.
March 12, 1982.
*411 J. Barrett Jones, Lynchburg, for appellant in No. 802043.
Walter C. Erwin, III, Asst. City Atty., for appellee in both cases.
Marshall Coleman, Atty. Gen., Jane D. Hickey, Sp. Asst. Atty. Gen., John A. Rupp, Asst. Atty. Gen., on brief, amicus curiae, Commonwealth of Va., Dept. of Welfare, for appellee in both cases.
Robert E. Shepherd, Jr., Richmond, on brief, amicus curiae, Youth Advocacy Clinic, T. C. Williams School of Law, University of Richmond, for appellee in both cases.
Curtis M. Coward, Lynchburg (Bell, Coward, Morrison & Spies, Lynchburg, on brief), for appellant in No. 802047.
Before CARRICO, C. J., COCHRAN, COMPTON, THOMPSON and STEPHENSON, JJ., and HARRISON, Retired Justice.
CARRICO, Chief Justice.
Lorene P. Harris and Eli Woodson are the unmarried parents of Eli Woodson Harris, born September 5, 1976, and Gwendolyn Darshella Harris, born July 24, 1977. Upon the petitions of the Lynchburg Division of Social Services and pursuant to Code § 16.1-283(C)(2),[1] the trial court terminated *412 Harris' and Woodson's residual parental rights and authorized the Division to place the children for adoption. Harris and Woodson were granted separate appeals.
Harris is the mother of two other children, Moncil and Rayneil, both older than Eli and Gwen. Harris' parental rights to Moncil were terminated in January, 1977. Rayneil, acknowledged by Woodson as his child, was placed in the custody of Woodson's mother pursuant to court order, and the child remained there at the time of the hearing in the trial court.[2]
On January 17, 1977, young Eli was hospitalized, suffering from pneumonia and a "failure to thrive." Upon his release, he was placed in a foster home. On February 7, he was committed to the Division. On April 1, he was returned to his mother on a trial basis. After the Division received and substantiated two "protective service complaints," both Eli and Gwen were removed from the mother's home in October, 1977. The children were placed in foster care, where they have remained since.
Both before and after this placement, and especially during the autumn of 1976 and the winter of 1977, the Division provided extensive services to Harris. These services included job training, job placement, and referrals and transportation to community and charitable agencies and organizations. While some of these services were not repeated in 1978, the Division continued to assist Harris in solving food, fuel, and housing problems and in referring her to "ecumenical [and] charitable organizations." The Division concentrated its efforts upon helping Harris establish a stable home so the children could be returned to her.
Harris was unemployed while the children were in her custody; her only source of income was a monthly check of $158 for aid to dependent children. After Eli and Gwen were removed from Harris' home, she held a variety of jobs, including work as a kitchen helper, in an effort to improve her financial situation.
The Division arranged for visitation between Harris and the children, but there were "numerous problems," including Harris' failure to keep appointments for visits. At times, the Division provided food and fuel so the children could visit Harris in her home. Initially, Harris visited the children sporadically, but she began in March, 1978, to visit them once a month.
In August, 1978, Harris was arrested and charged with assaulting a police officer and resisting arrest. Subsequently, she was convicted and sentenced to a term of five years in prison. She still was incarcerated at the time of the hearing in the trial court, but her application for parole was scheduled for consideration in two months.
While in prison, Harris worked in the prison laundry and as a key punch operator. She obtained a "General Educational Development Diploma" and a "Certificate in Secretarial Science." She corresponded frequently with the social worker assigned to her children, inquiring about their well-being and sending them messages on holidays and birthdays. At her request, the children visited her in prison once in 1979 and three times in 1980. She planned to establish normal parental relations with the children upon her release.
Meanwhile, on October 1, 1978, Woodson had been committed to jail for a misdemeanor. While in jail, he did not contact *413 his children or inquire about them. Following his release in April, 1979, he obtained regular employment at a Holiday Inn and began making payments to his mother for the support of his daughter Rayneil. For a time he lived alone, but he later moved in with his mother, and Rayneil has "prospered" in their care.
On February 5, 1980, Woodson was contacted by the Division with respect to the termination of his parental rights to Eli and Gwen. Prior to that time, he was not aware that he had any rights to the children, and he had not attempted to visit them. Nor had he ever contributed to their support. After the Division's contact, Woodson began visiting the children, and he established and made regular contributions to savings accounts for them. While the children did not regard Woodson as their "psychological parent" and were "distant" initially, his relationship with them improved steadily.
On March 19, 1980, upon petitions filed by the Division, the juvenile and domestic relations district court entered orders terminating Harris' and Woodson's residual parental rights to Eli and Gwen and authorizing the Division to place the children for adoption. Woodson opposed termination and appealed the juvenile court's orders. While the appeal was pending, he continued to visit the children, and he contributed $210 toward their support.
Harris also opposed termination and appealed the juvenile court's orders. Following a hearing, the circuit court entered orders on September 23, 1980, reciting that termination of parental rights was in the children's best interests and that the parents, within the meaning of Code § 16.1-283(C)(2) and "without good cause, [had] been unwilling or unable within a reasonable period to remedy substantially the conditions which led to [the children's] foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end."
Citing our 1975 decision in Rocka v. Roanoke Co. Dep't of Welfare, 215 Va. 515, 211 S.E.2d 76, Harris and Woodson both contend that their residual parental rights cannot be terminated absent a specific finding of parental unfitness.[3] They say the trial court made no such finding with respect to either parent, but merely found the existence of the factors listed in § 16.1-283(C)(2). Nothing in this new Code section, Harris and Woodson maintain, alters the Rocka requirement.
We disagree. In a related case decided today, we held that the enactment of § 16.1-283(C)(2) eliminated the necessity for a specific finding of parental unfitness in termination proceedings between parents and social agencies. A finding that the factors listed in § 16.1-283(C)(2) exist, we said, is tantamount to a finding of parental unfitness. Knox v. Lynchburg Div. of Soc. Ser., 223 Va. ___, ___, 288 S.E.2d 399, 402 (1982). See also Toombs v. Lynchburg Div. of Soc. Ser., 223 Va. ___, ___ n. 2, 288 S.E.2d 405, 406 n. 2 (1982).
Both Harris and Woodson contend next that the orders terminating their parental rights are unsupported by the clear and convincing evidence required by § 16.1-283(C)(2). Their arguments on this point diverge, however, and will be treated separately.
Harris argues that the evidence does not support the trial court's findings that she was unwilling or unable, without good cause and despite the assistance of rehabilitative agencies, to remedy the conditions that led to Eli's and Gwen's placement in foster care. Rather, Harris says, the evidence displays a "sustained level of cooperation with the Division ... and a high degree of attentiveness to the development of her children"; she made "substantial progress" toward improving living conditions for the children; she "sought to address her housing problems"; she obtained *414 a variety of jobs; and she advanced her education and skills through her prison courses and employment. Furthermore, Harris asserts, she showed consistent and active interest in her children, and she planned, when released from prison, to establish normal relations with them.
Harris argues further that, while the Division assisted her extensively prior to the time she lost custody of Eli and Gwen, it only referred her to other agencies or organizations after that time and made no "significant efforts" itself to help remedy the problems that led to foster care. Harris admits "there was little beyond post-release planning the Division could have done" while she was incarcerated. She says, however, that, because the Division failed to make reasonable and appropriate efforts on her behalf prior to her incarceration, the trial court should not have terminated her rights but should have required the Division to assist her upon her ultimate release.
Concluding this argument, Harris says that her incarceration was the primary cause of her inability to remedy the conditions that led to foster care. Hence, she submits, her failure to remedy the conditions was not without good cause.
We disagree with Harris. We believe that the record contains clear and convincing evidence supporting the trial court's findings in her case. Harris lost her first child, Moncil, to foster care in February, 1974. Beginning the following September, the Division assisted Harris in efforts to remedy the conditions in her home. This assistance was extensive, but obviously futile; Moncil never returned home and Eli, Gwen, and Rayneil all had to be removed. Thereafter, the Division continued to assist Harris with what we believe were "significant efforts."[4] Although the Division did not repeat all the services it previously rendered Harris, it concentrated its efforts toward helping her establish a stable home so Eli and Gwen could be returned to her. Notwithstanding the Division's assistance, Harris was still in no position to resume care of her children when she was arrested in August, 1978.
Harris concedes that, while incarcerated, she could not have established a suitable home for Eli and Gwen, but she says that her punishment should not be enhanced by terminating her rights to the children without reason. We agree with that proposition. We will not allow Harris, however, to use her incarceration as reason to excuse her prior neglectful treatment of her children or to say that her failure to remedy the conditions in her home was without good cause.
This brings us to Woodson's argument concerning the sufficiency of the evidence. He says absolutely no evidence supports the trial court's finding that rehabilitative agencies made reasonable and appropriate efforts to assist him in remedying the conditions that led to Eli's and Gwen's foster care placement. The rendering of such assistance is a prerequisite to termination of parental rights under § 16.1-283(C)(2), Woodson submits, and, hence, the orders terminating his rights must be reversed.
The Division does not contend it offered or provided Woodson any assistance. It says it made out a prima facie case for termination pursuant to the provisions of subparagraphs (a) and (b)[5] of § 16.1-283(C)(2) *415 when it showed that Woodson had failed, without good cause, to communicate with Eli and Gwen for a period of twelve months or to make reasonable progress, under a foster care plan, toward the elimination of the conditions that led to the children's foster care placement. In any event, the Division maintains, Woodson never contacted it or requested any assistance, and it should not be required to force its services upon a parent who does not want them.
While the Division makes no claim Woodson was ever aware of a foster care plan, we will assume for the purposes of this discussion that the Division did make out a prima facie case for termination of Woodson's parental rights. But where, as here, there is undisputed evidence that a parent has not been offered or provided services, the prima facie case is overcome, and the party moving for termination is put to the burden of proving the factors listed in § 16.1-283(C)(2). And, in the absence of such proof, reversal of a termination order is required. Weaver v. Roanoke Dept. of Human Res., 220 Va. 921, 265 S.E.2d 692 (1980).
This is not to say that the Division must force its services upon an unwilling or disinterested parent. But that is not the situation here; because Woodson was not offered any services, we have no way of knowing whether he would have been willing or interested. We believe he is entitled to the offer and to an opportunity to show what progress he can make with the assistance of the Division and other agencies toward establishing, within a reasonable period, a suitable home for Eli and Gwen. This requires reversal of the orders terminating Woodson's rights to Eli and Gwen and remand of the case with direction to permit Woodson the specified opportunity.
This result in Woodson's case activates Harris' final contention. She argues that we should not deny her relief while granting relief to Woodson. We reject the argument. Code § 16.1-283(A) provides that the court "may terminate the residual parental rights of one parent without affecting the rights of the other parent." We believe the situation presented here requires the action permitted by this provision.
For the reasons assigned, the orders terminating Harris' residual parental rights to Eli and Gwen will be affirmed. The orders terminating Woodson's rights will be reversed, and his case will be remanded for the relief indicated previously.
Record No. 802043  Affirmed.
Record No. 802047  Reversed and remanded.
NOTES
[1] § 16.1-283. Termination of residual parental rights. 

* * * * * *
C. The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent or parents or other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
* * * * * *
2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.
[2] Woodson's counsel stated during oral argument that Woodson has now been awarded custody of Rayneil. This fact does not appear in the record, however, and we will not give it further consideration.
[3] In Berrien v. Greene County, 216 Va. 241, 217 S.E.2d 854 (1975), we reaffirmed the Rocka rule.
[4] Harris maintains that the Division's failure to assist her beyond referring her to other agencies or organizations brings her case within the rule of Weaver v. Roanoke Dept. of Human Res., 220 Va. 921, 265 S.E.2d 692 (1980), viz., that a social service agency's failure to assist a parent in remedying conditions that cause foster care will result in reversal of a termination order. The record in Weaver, however, did not show what, if any, measures were taken by rehabilitative agencies. The present record with respect to Harris' case presents an entirely different situation.
[5] § 16.1-283. Termination of residual parental rights. 

* * * * * *
Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subparagraphs C 1 or 2 hereof:
a. The parent or parents have failed, without good cause, to communicate on a continuing or planned basis with the child for a period of twelve months; or
b. The parent or parents, without good cause, have failed or have been unable to make reasonable progress towards the elimination of the conditions which led to the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a social, medical, mental health or other rehabilitative agency.