# COURT OF APPEALS OF VIRGINIA

<div style="transform: rotate(-90deg)">UNPUBLISHED</div>

Present: Judges Huff, Athey and Fulton
Argued at Lexington, Virginia


AMANDA MARIE SPRINKLE

MEMORANDUM OPINION* BY
v.      Record No. 1273-22-3      JUDGE JUNIUS P. FULTON, III
SEPTEMBER 26, 2023

ROANOKE CITY DEPARTMENT
  OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Onzlee Ware, Judge

John S. Koehler (The Law Office of James Steele, PLLC, on briefs),
for appellant.

Jennifer L. Crook, Assistant City Attorney (Timothy R. Spencer,
City Attorney; Sarah Jane Newton, Guardian ad litem for the minor
children, on brief), for appellee.


Amanda Marie Sprinkle ("mother") appeals the trial court's order terminating her parental

rights under Code § 16.1-283(B) and -283(C)(2). Mother argues that the trial court erred in finding

there was sufficient evidence to terminate her parental rights because "[m]other had complied with

all requirements of [the Roanoke City Department of Social Services] to complete the goal of

returning the children to her custody and the testimony of Dr. Debra Marks established that Sprinkle

was capable of parenting the children." On brief, mother further argues that *Edwards v. Arlington

County*, 5 Va. App. 294, 312 (1987), requires that the trial court make an affirmative finding that no

"less drastic" alternative exists and that the "only viable result" from the evidence is termination of

parental rights. We find no error and affirm the trial court's judgment.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)). Here, the Roanoke City Department of Social Services ("the Department") was the prevailing party, so we recite the evidence, and the inferences flowing from it, in the light most favorable to the Department.

Mother is the biological parent to B.M., P.M., and L.M.,[2] the subjects of this appeal. In October 2020, mother and her three children lived with the children's father, Brandon Milliner.[3] The children were placed in foster care after the Roanoke City Police Department and the Department of Social Services searched the family's home on October 29, 2020, as part of a separate investigation and determined the conditions of the home to be unsafe for the children. The search revealed drug paraphernalia throughout the home, open liquor bottles in reach of the children, and holes in the walls due to domestic violence in the home. The children were removed from the home, and upon a petition by the Department, the Roanoke City Juvenile and Domestic Relations District Court ("the JDR court") adjudicated that all three children were

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues mother has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[2] The children were ages five, four, and two respectively at the time of trial.

[3] Milliner initially "expressed interest in participating in the foster care case," but ultimately was not "an active participant in the foster care case" and later signed an entrustment agreement surrendering custody of the children.

abused and neglected and entered dispositional orders. Mother did not appeal the dispositional orders.

The Department initially pursued a foster care goal of return home. In the months following the children's placement in foster care, mother underwent a psychological examination and received "one-on-one parenting lessons," as well as counseling for mental health and substance abuse. The Department ultimately changed its goal to adoption on the basis that although mother had "made progress in her outpatient mental health and substance abuse treatment, . . . there continue[d] to be overarching concerns [for] her parental capacity and her ability to care for her children." The JDR court subsequently entered orders terminating mother's parental rights to the children and approving the foster care goal of adoption. Mother appealed those orders to the circuit court.

The circuit court held a hearing on June 7, 2022. At the hearing, the Department introduced testimony from several witnesses including, among others, a licensed clinical psychologist, Dr. Klaire Mundy, who had conducted a psychological evaluation of mother in March 2021. Before the evaluation began, Dr. Mundy testified that it took mother thirty to forty-five minutes to understand that the evaluation had to be completed independently and that mother's sister could not be present. During the forensic interview portion of the evaluation, mother self-reported that: (1) she tested positive for cocaine, (2) she was only attending the various services the Department had provided to her because they were requested, not because she felt like she needed them, and (3) she and Mr. Milliner had a lot of violence and aggression in their relationship.

Dr. Mundy further testified that, in her professional opinion, mother: (1) "had very limited insight [and] had a hard time identifying what the concerns and problems were that got her to the office," (2) "got cognitively stuck significantly during the administration of the tools

that were provided to her. She required a lot of feedback. She . . . became kind of overwhelmed and frustrated and required the evaluator to give her support and on-going feedback," (3) "didn't appear to have any kind of awareness about what her strengths and weaknesses were," (4) had "difficulty with taking any information and putting it into action," and (5) "struggles with processing information." Dr. Mundy testified that:

> When we translate that into parenting and we look at having three children of which are high needs, trying to manage that in a way that's going to keep the children safe is potentially very problematic for her. . . . [O]nce she got off track, she was unable to get back on track, which is another concerning thing . . . so it's not even about giving her a minute to try and pull herself back together, it's similar to what I saw in the waiting room with her sister. It took an extraordinary amount of time for her to get back on track, to be able to focus and move forward in the evaluation.

Dr. Mundy testified when mother becomes cognitively stuck it is a problem in child-rearing because mother cannot move forward to solve a problem, so "then the kids have to start solving . . . problems themselves . . . and depending on the age of the child, that may or may not be problematic." Dr. Mundy noted mother's auditory processing disorder and frontal lobe issues would affect mother's ability to anticipate needs, follow up with doctors, plan, problem-solve, and organize her thoughts.

Dr. Mundy also noted that she would be extremely concerned if mother wanted to homeschool her children because mother's intellectual functioning ranges between the below average and the impaired region. In addition, Dr. Mundy opined that mother's "verbal comprehension was the lowest of all the indexes and that's one of the things that are relied on most heavily when it comes to homeschooling children."[4] Specifically, Dr. Mundy noted that "No matter how much she wants to help the children, no matter how hard she tries to help the

---

[4] As will be further developed below, mother testified that if her children were returned to her, she intended to homeschool them.

children, she doesn't have the intellectual capacity to do what they need for her to do to get them to a point where they can successfully meet the criteria for academics."

Finally, Dr. Mundy testified about how mother's intellectual deficiencies and dependency on others impact her ability to parent. Dr. Mundy testified that "[i]t impacts her interpersonal choices leading her to engage in relationships with others who have substance abuse issues, and there is domestic violence involved." Dr. Mundy further stated that mother tends to "place her relationships with others primary to the safety of her children." Dr. Mundy ultimately opined that mother "did not appear to possess the cognitive or interpersonal skills and development that is really necessary in order to engage in the least level that the American Psychological Association says is a good enough parent."

Maggie Evans, mother's parent aid, testified that she would monitor mother's family time visitation at the Department. Ms. Evans noted that when the children would run out of the room or jump on the table during family time visitation, mother would freeze and would not know what to do to redirect the children. Ms. Evans testified that as time went on, mother's family time visitations were more uncontrolled. Ms. Evans stated that during the seven months she worked with mother, there was no improvement in mother's family time visitation or parenting skills. Ms. Evans testified that the children would not be safe in mother's sole full-time care.

Alaney Kulenek, the foster care worker for B.M., P.M., and L.M. testified that the children came into care on October 29, 2020, due to "abuse and neglect." Ms. Kulenek noted the goal for the children at the initial foster care hearing was return home. Ms. Kulenek stated the responsibilities for mother included: (1) completing a psychological and parental capacity evaluation, (2) complying with random drug screens, (3) completing substance abuse treatment, mental health treatment, and "specifically counseling focused on domestic violence," (4) complying with parenting classes and refraining from contact with Mr. Milliner due to "their

history of severe domestic violence," and (5) and providing proof of stable housing and stable income. On cross-examination, Ms. Kulenek acknowledged that mother "completed the services that were on her service plan" and ultimately "completed everything that she was asked to do."

Ms. Kulenek testified in detail about the developmental challenges that each child faced. B.M. was not toilet trained, he had been diagnosed with developmental delays, speech delays, and an attachment disorder called disinhibited social engagement disorder. Ms. Kulenek also reported that B.M. struggled with "oppositional behaviors," struggled to get along with his brother, and at times can be aggressive. Further, B.M. did not know any typical pre-school skills such as colors or numbers. P.M. similarly was not toilet trained and also had been diagnosed with a developmental delay, a speech delay, and the same attachment disorder that B.M. was diagnosed with. Ms. Kulenek testified that P.M. "has frequent outbursts[,] difficulty regulating his emotions[, and was] physically aggressive towards adults and peers." L.M. did not engage in eye contact when she was first brought into the foster care system, and it took her several months to start doing so. Further, she demonstrated "some signs that she may . . . [have] experienced food insecurity." However, Ms. Kulenek also reported that, since going into foster care, each child has shown a marked improvement in their development. Notwithstanding their progress since going into foster care, however, Ms. Kulenek testified that mother still intended to homeschool her children because she felt that the only thing her children needed was "to be with her."

Ms. Kulenek testified that even though the children have been in foster care since late 2020, and even though mother has been working with the Department to improve her parenting skills since that time, there continue to be overarching concerns regarding mother's parenting capacity. Ms. Kulenek stated that mother "has been unable to demonstrate that she can master even basic parenting techniques such as timeouts, consequence." Ms. Kulenek testified that

mother has been unable to remedy the concerns that brought the children into foster care and mother has not been able to demonstrate that she's a safe and reliable caregiver for the children.

Mother introduced testimony from witnesses including, among others, the counselors and clinicians with whom she worked to improve her parenting skills after the children were placed into foster care. This included a licensed clinical psychologist, Dr. Marks, who conducted a psychological evaluation of mother in January 2022.

Dr. Marks testified that she evaluated mother's parenting skills through an extensive clinical interview. Dr. Marks's evaluation took place ten months after Dr. Mundy evaluated mother, and Dr. Marks testified that mother's results from the latter evaluation showed improvement from the prior evaluation. Dr. Marks opined that although mother still showed the need for improvement in her decision-making skills, time management and emotional security, she demonstrated that she could continue to improve with proper counseling and therapy. In her view, Dr. Marks opined that mother "deserve[d] a chance" to be reunited with her children. Dr. Marks recommended a gradual reunification process to give mother time to develop the appropriate responses to the children's needs.

Mother also presented testimony from John Holm, a substance abuse counselor, Katelyn Carter, a licensed professional counselor, and Tahriana Kasey, a skill building clinician, each of whom had provided counseling and drug testing services to mother upon referral by the Department. Mother had passed all her drug screens since April 15, 2021. Mother was cooperative in her treatment and showed beneficial progress according to all three counselors. Her treatment included addressing her substance abuse issues, her trauma from domestic violence, and emotional processing. Kasey testified that mother was maintaining her home in good order, stating that it is clean and organized. She also provided mother with counseling on

improving her parenting skills and finding community resources, stating that she has shown continuing, gradual improvement in these areas.

Mother testified on her own behalf. Through her testimony the trial court received into evidence photographs of the home where she resided with her fiancé (now husband) which showed she had prepared the home to provide a safe and suitable environment for the children should the goal of return to family continue to be the overarching goal. She also testified that she had obtained employment and was seeking other opportunities for better wages. Mother conceded that she had difficulty managing the three children during visitation. However, she had improved her ability to discipline them appropriately. Mother stated that she wished to continue working toward regaining custody of her children.

After hearing all the evidence, the trial court allowed the parties to submit written closing arguments and subsequently issued a letter opinion, finding there was sufficient evidence to terminate mother's parental rights to all three children under Code § 16.1-283(B) and (C)(2). The trial court found that mother "has cognitive impairments and mental health concerns that continually prevent her from addressing the needs of her three children," and "[a]ttempts to improve [mother's] parenting abilities to ensure the health, safety, and developmental needs of the children have been unsuccessful and show no indication that they may someday become successful." The trial court further found that mother had "failed to secure a safe home, to demonstrate the ability to provide for three children, and voluntarily engaged with [father] despite repeated instances of domestic violence between the two." Finally, the trial court noted that, "[a]lthough the Department provided numerous services to [mother], including seven months of one-on-one parenting support, she failed to demonstrate meaningful gain in her parenting ability, in part, because of her cognitive limitations." On July 27, 2022, the trial court

entered an order terminating mother's parental rights to the children and approving the foster care goal of adoption. This appeal followed.

ANALYSIS

On appeal, mother challenges the sufficiency of the evidence to support the trial court's decision to terminate her parental rights. Specifically, she puts forth two arguments to support her contention that the trial court erred: (1) the evidence received by the trial court, specifically Dr. Marks's testimony, illustrated that she was, in fact, a "good enough" parent and (2) there were alternative remedies less drastic than termination of parental rights that would have enabled mother to regain custody of her children.

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (alteration in original) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "The circuit court has 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" *Eaton v. Washington Cnty. Dep't of Soc. Servs.*, 66 Va. App. 317, 324 (2016). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)).

The trial court terminated mother's parental rights under Code § 16.1-283(B) and -283(C)(2). Code § 16.1-283(B) authorizes the court to terminate a parent's parental rights to a child if the child has been previously abused or neglected, and:

> 1. The neglect or abuse suffered by such child presented a serious
> and substantial threat to his life, health or development; and
> 2. It is not reasonably likely that the conditions which resulted in
> such neglect or abuse can be substantially corrected or eliminated

so as to allow the child's safe return to his parent or parents within a reasonable period of time. In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.

It is clear, from the evidence recited above and received by the trial court, that a reasonable fact finder could have found that the evidence was sufficient to terminate mother's residual parental rights under Code § 16.1-283(B).[5] First, mother does not challenge the prior adjudication of abuse and neglect, nor could she, as she did not appeal that decision. Second, mother does not challenge the trial court's finding as to the first subsection of Code § 16.1-283(B), that that abuse or neglect "presented a serious and substantial threat to [the children's] life, health or development." Mother's appeal challenges only the trial court's findings as to the second subsection of Code § 16.1-283(B). However, the Department introduced sufficient evidence for a reasonable fact finder to make the required findings and conclusions contained in subsection (2). Code § 16.1-283(B) provides three circumstances that constitute "prima facie evidence of the conditions set forth in subdivision (B)(2)," the first of which being:

> The parent or parents have a mental or emotional illness or intellectual disability of such severity that there is no reasonable expectation that such parent will be able to undertake responsibility for the care needed by the child in accordance with his age and stage of development[.]

Code § 16.1-283(B)(2)(a).

---

[5] We do not address any arguments related to the trial court's parallel findings under Code § 16.1-283(C)(2), as "[w]hen a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo*, 68 Va. App. at 574 n.9. Terminations under Code § 16.1-283(B) and -283(C)(2) provide distinct, "individual bases upon which a petitioner may seek to terminate residual parental rights." *City of Newport News Dep't of Soc. Servs. v. Winslow*, 40 Va. App. 556, 563 (2003).

The trial court, in its letter opinion, expressly found that "[mother] has cognitive impairments and mental health concerns that continually prevent her from addressing the needs of her three children, as evidenced by Dr. Mundy's report and the supervised visitation report of Alaney Kulenek." Further, the trial court found that "[a]ttempts to improve [mother's] parenting abilities to ensure the health, safety, and developmental needs of the children have been unsuccessful and show no indication that they may someday become successful." Therefore, the trial court held that "[The Department] ha[d] carried its burden as to Va. Code § 16.1-283(B)." The trial court's findings in this regard are sufficient to satisfy the requirements of Code § 16.1-283(B)(2)(a), and we cannot say that these findings constitute clear error.

On brief, mother points to the testimony of Dr. Marks, arguing that "[b]oth Dr. Mundy and Dr. Marks agreed that [mother] was not yet ready to parent the children on her own, with the only difference being that Dr. Marks . . . gave a more positive assessment of [mother's] ability to continue toward that goal." Further, mother argues that "[w]hile the evidence also established that [mother] required additional counseling and assistance to improve her parenting skills, Dr. Marks believed that this could be achieved through a staged reintegration of the family, with Dr. Mundy concurring that [mother] could develop adequate parenting skills if given appropriate co-parenting assistance." To the extent that mother contends that Dr. Marks and Dr. Mundy were in agreement regarding mother's ability to parent the children if given appropriate resources and assistance, this contention mischaracterizes the record. Dr. Mundy did not concur in Dr. Marks's conclusion that mother could develop adequate parenting skills if given appropriate co-parenting assistance. This assertion is based upon a portion of Dr. Mundy's testimony where she qualified her "recommendation" by stating that "*should*" the trial court decide not to terminate mother's parental rights, then Dr. Mundy would suggest some sort of "co-parenting" system be administered in partnership with the Department. This testimony was

- 11 -

not an endorsement of such a co-parenting system; instead, it simply reflects the fact that Dr. Mundy was hedging against the possibility that the trial court ultimately may have decided not to terminate mother's parental rights, notwithstanding the fact that Dr. Mundy adamantly believed that mother was not capable of parenting her children. Dr. Mundy's testimony was clear however, that she did not believe that mother could meet the standard of being a "good enough parent." Dr. Mundy testified that this standard included the ability to make decisions concerning the safety of her children, something mother was demonstrably not able to do, based on her mental deficiencies. In contrast to mother's characterization, the two clinical psychologists actually disagreed as to the best course of action, with Dr. Marks taking the position that mother could, in fact, succeed as a parent at some point in the future, if given the appropriate assistance.

The trial court was entitled to accept Dr. Mundy's conclusion and reject Dr. Marks's conclusion, to the extent that it diverged from Dr. Mundy's. *See Ridgeway*, 59 Va. App. at 190 (A trial court's "finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." (quoting *Martin*, 3 Va. App. at 20)); *see also Logan*, 13 Va. App. at 128 ("[T]he evidence is viewed in the light most favorable to the prevailing party below and its evidence is afforded all reasonable inferences fairly deducible therefrom."). On review, we presume that the trial court thoroughly weighed the evidence in front of it, considering the best interests of the three children. *See Logan*, 13 Va. App. at 128. "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" *Id.* (quoting *Peple v. Peple*, 5 Va. App. 414, 422 (1988)). We cannot say that the trial court clearly erred in finding the evidence sufficient to terminate mother's residual parental rights.

Further, we note that mother's argument also relies on the mere possibility that at some future date, mother *might* be able to meet the standard of a "good enough" parent and adequately care for her children. This argument ignores Virginia precedent that places the best interests of *the children* ahead of mother's interests as the parent. *See Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990) ("It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities."). Here, the children were initially removed from mother's custody on October 30, 2020, nearly three years ago. Since then, mother has participated in various programs offered by the Department and has spent time visiting with her children, and yet she still shows little if any development in her ability to adequately care for her children. "In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." *Farley v. Farley*, 9 Va. App. 326, 328 (1990) (citing *Eichelberger v. Eichelberger*, 2 Va. App. 409, 412 (1986)).

To the extent that mother argues on brief that Code § 16.1-283 "contemplates the use, where possible, of alternatives less drastic than termination of parental rights" and that the Department was required to prove that "termination of [mother's] residual parental rights was the only available remedy for the [trial] court,"[6] mother did not raise that argument at trial in either her closing argument or a motion to strike, and therefore it is waived. "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of

---

[6] In making this argument, mother cites to *Knox v. Lynchburg Div. of Soc. Servs.*, 223 Va. 213 (1982), and *Edwards*, 5 Va. App. 294.

justice."[7]  Rule 5A:18.  "This contemporaneous-objection requirement affords 'the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 236 (2022) (quoting *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015)).

<div align="center">CONCLUSION</div>

For the foregoing reasons, the trial court did not abuse its discretion in terminating mother's parental rights.  The trial court's judgment is affirmed.

<div align="right">*Affirmed*.</div>

---

[7] Mother does not invoke the "good cause" or "ends of justice" exceptions in Rule 5A:18, and "we will not sua sponte raise them on [her] behalf."  *Hammer v. Commonwealth*, 74 Va. App. 225, 236 (2022) (quoting *Jones v. Commonwealth*, 293 Va. 29, 39 n.5 (2017)).