COURT OF APPEALS OF VIRGINIA


Present:    Judges McClanahan, Haley and Senior Judge Willis


TERESA HUFFMAN
                                                    MEMORANDUM OPINION[*]
v.        Record No. 2256-10-3                              PER CURIAM
                                                           JULY 5, 2011
ROANOKE CITY DEPARTMENT OF SOCIAL SERVICES


                FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
                            Charles N. Dorsey, Judge

            (Phillip R. Lingafelt; Glenn, Feldmann, Darby & Goodlatte, on
            briefs), for appellant.  Appellant submitting on briefs.

            (William M. Hackworth, City Attorney; Heather P. Ferguson,
            Assistant City Attorney; Diana M. Perkinson, Guardian *ad litem* for
            the minor child, on brief), for appellee.  Appellee and Guardian
            *ad litem* submitting on brief.


        On October 18, 2010, the trial court entered an order terminating the residual parental

rights of Teresa Huffman (hereinafter "mother") to her daughter, C.T.  On appeal, mother argues

the trial court erred by:  (1) finding the evidence sufficient to terminate her parental rights

pursuant to Code § 16.1-283(C)(2); (2) finding mother created the conditions that led to foster

care for C.T. and the continuation of her foster care; (3) finding that the Roanoke City

Department of Social Services ("DSS") provided mother with reasonable and appropriate efforts

to remedy the conditions that led to C.T.'s foster care; and (4) finding that termination of

mother's parental rights was in C.T.'s best interests.  For the reasons stated herein, we affirm the

trial court's decision.

_____
        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Background

We view the evidence[1] in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

C.T., born February 25, 1999, was removed from mother's custody on January 28, 2000, while mother was living in a shelter for battered women. On July 18, 2000, the juvenile and domestic relations district court awarded custody of the child to mother's friends, Reed and Cyndy Lombart, and granted visitation to mother and her husband, Mark Ferris (hereinafter "father"). The Lombarts retained custody of C.T. for several years, during which time mother and father were granted visitation.

Thereafter, the Lombarts divorced. On April 25, 2005, the juvenile and domestic relations district court transferred C.T.'s custody to her paternal grandparents, Eva and Mason Ferris. Between 2005 and 2007, C.T. began living with her father. On October 17, 2007, DSS received a report that father was physically abusing C.T. and his other children. Following a founded abuse investigation, C.T. resumed living with her paternal grandparents.

In May of 2009, C.T. was removed from her grandparents' home after she began acting out sexually toward the younger children in the family. Police suspected C.T. had been the victim of sexual abuse and initiated a criminal investigation into her alleged abuser. DSS offered numerous services to the grandparents in an attempt to maintain C.T.'s placement with them, but C.T.'s behavior grew worse, and the grandmother developed health problems which necessitated the amputation of her leg. The grandparents notified DSS they could no longer care for C.T. due to her behavior problems and their own physical limitations.

---

[1] The facts are drawn from the statement of facts filed in lieu of a transcript, pursuant to Rule 5A:8(c).

After C.T. was removed from her grandparents' custody in May 2009, DSS attempted to locate mother and father. After being initially unable to get in touch with mother at her last known address, DSS conducted a computer search and secured mother's telephone number.

A social worker spoke with mother on July 8, 2009, and arranged to meet with her two days later at DSS. Mother did not show up for the meeting, but called DSS on July 14 and left a message stating she had "forgotten" about the meeting and wanted to reschedule. The social worker returned mother's call in order to reschedule the meeting and left a message, but mother failed to follow up.

The initial foster care service plan after C.T.'s placement in foster care established a goal of returning C.T. to her paternal grandparents. This service plan, filed in July 2009, required mother to "make contact with DSS[,] participate in an assessment to determine what services [we]re required by DSS[,] [and] comply with any and all recommended services by DSS[.]"

A certified letter was sent to mother notifying her of the dispositional hearing scheduled for August 5, 2009, but mother did not appear at the hearing. Mother did not return the social worker's last July phone call until October 21, 2009. At that time, she stated she would like to have visitation with her daughter, but was not interested in obtaining custody. Mother met with the social worker to arrange visitation and began visiting C.T. on October 22, 2009.

During the December 22, 2009 visit with C.T., mother announced she had changed her mind about wanting custody and would like DSS to assist her in obtaining employment. The following month, DSS sent mother a letter referring her to the Roanoke Valley Work Force Center and providing her with detailed instructions as to the steps necessary to petition for custody of C.T. After the letter was returned, DSS called mother, and mother informed the social worker she had been experiencing problems with the post office. Mother instructed the social worker to send future correspondence to C.T.'s maternal grandmother. The social worker

again sent the letter to the maternal grandmother's address, but mother never filed a petition for custody of C.T.

On January 27, 2010, a permanency planning hearing was held before the juvenile and domestic relations district court. Due to the lack of progress with mother, and the grandparents' unwillingness to have C.T. return to their home, DSS changed its goal from placement with the paternal grandparents to placement with a relative. Mother attended the hearing and advised the court she was unable to assume custody of C.T. at that time. Mother's goals following the planning hearing included maintaining regular and consistent contact with DSS, participating in an assessment to determine what services were required, completing any services recommended by DSS, completing a criminal background check, attending bi-weekly visitation with C.T., undergoing random drug screenings, and having all adults in her household complete a criminal background and CPS record check.

Mother attended approximately one-half of the scheduled visitations with C.T. and did not complete the criminal background check requested by DSS. On April 6, 2010, mother informed foster care worker Meghan Childers that she was leaving her current husband due to domestic violence issues. Mother also informed Childers that her husband was opposed to her visits with C.T. and had been interfering with her visitation. As mother already had a list of rental agencies for low-income families, Childers provided mother with the phone number of the housing authority. Childers also gave mother information about a program assisting victims of domestic violence.

At the termination hearing on October 4, 2010, social worker Robin Freeman testified that DSS investigated a complaint involving mother's one-year-old son during the time C.T. was in foster care. Freeman testified mother provided Freeman with four different addresses during the investigation, but Freeman was never able to get in touch with mother at any of the addresses

and was never able to verify an address for her. Mother acknowledged she lied to Freeman about her address, but maintained she did so because she wanted to prevent her husband from learning her whereabouts.

At the time of the termination hearing, mother, her husband, and her son were living with a friend in a leased two-bedroom trailer. Mother was unemployed, and neither mother nor her husband were parties to the lease. A bedroom was available for C.T. only if mother, her husband, and her son slept in the living room. Mother maintained she had provided DSS with her finger-print card and the criminal background information pertaining to her and her family, but it had been lost in the mail.

At the time of the termination hearing, C.T. was doing well in her foster home. She was not exhibiting the sexual behaviors that had been problematic in her grandparents' home. She had bonded with her foster family, was participating in counseling, and was active in school and in the community.

Analysis

In reviewing a decision to terminate a parent's residual parental rights, we are mindful that "'[t]he termination of [residual] parental rights is a grave, drastic and irreversible action,'" Helen W. v. Fairfax Cnty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Department of Pub. Welfare of the City of Richmond, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)), but presume the trial court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Fields v. Dinwiddie Cnty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005) (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)). "The trial court's judgment, 'when based on evidence heard *ore tenus,* will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Toms v. Hanover Dep't of Soc.

- 5 -

Servs., 46 Va. App. 257, 266, 616 S.E.2d 765, 769 (2005) (quoting Fields, 46 Va. App. at 7, 614

S.E.2d at 659). "In its capacity as a factfinder . . . the circuit court retains 'broad discretion in

making the decisions necessary to guard and to foster a child's best interests.'" Id. (quoting

Farley, 9 Va. App. at 328, 387 S.E.2d at 795).

The trial court terminated mother's parental rights pursuant to Code § 16.1-283(C)(2).

That section reads as follows:

> C. The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent or parents or other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
> \* \* \* \* \* \* \*
>
> 2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a public or private social, medical, mental health or other rehabilitative agency shall constitute prima facie evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

On appeal, mother contends she complied with or made "substantial efforts" toward

remedying the conditions leading to C.T.'s foster care placement. She maintains she completed

all of the conditions imposed on her by DSS except for the criminal background check on her

and the criminal background and CPS check on the adults living in her home. Mother asserts she attempted to provide this information to DSS, but it was "lost."

As fact finder, however, the trial court was entitled to reject mother's explanation. "The credibility of witnesses and the weight to be accorded their testimony is a matter within the sole province of the finder of fact." Akers v. Fauquier Cnty. Dep't of Soc. Servs., 44 Va. App. 247, 264, 604 S.E.2d 737, 745 (2004). Presented with evidence that mother had failed to keep appointments with DSS, had expressed ambivalence about seeking custody of C.T., and had not petitioned for custody for C.T., the trial court could conclude mother never attempted to provide the information to DSS. Also supporting that conclusion was evidence that mother's husband was violent and opposed mother's visitation with C.T.

In addition to her failure to complete the criminal background check, mother also failed to satisfy the conditions of C.T.'s return to her by regularly attending visitation with C.T. and by maintaining regular and consistent contact with DSS. Mother attended only half of her scheduled visitation and repeatedly failed to provide DSS with an accurate home address.

As mother failed to satisfy even the preliminary conditions toward gaining custody of her daughter, DSS never reached the issue of whether mother could satisfy additional conditions such as appropriate housing and employment. Nevertheless, at the time of the termination hearing, mother was unemployed and did not have housing of her own. Furthermore, she had resumed living with her husband, a man who had previously opposed her visitation with C.T. and from whom she had attempted to "hide" in the wake of domestic violence.

Based on the evidence, the trial court did not err in concluding that mother had been "unwilling or unable within a reasonable time not to exceed twelve months" from the time C.T. was placed in foster care to "remedy substantially the conditions which led to or required continuation of" C.T.'s foster care placement.

At the time mother's parental rights were terminated, C.T. had been in foster care for approximately ten years. C.T.'s original placement in foster care resulted from mother's inability to care for her, and the record contains no evidence suggesting mother had ever taken steps to regain custody prior to C.T.'s removal from her paternal grandparents. When C.T. required a new placement, mother equivocated in her willingness to care for her. She failed to stay in touch with DSS and did not take the initial steps required to assist DSS in returning C.T. to her. Accordingly, the trial court was also entitled to find that mother created the conditions that led to and necessitated the continuation of C.T.'s foster care.

Likewise, the trial court did not err in concluding that DSS provided reasonable and appropriate services to mother. "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case." Ferguson v. Stafford Cnty. Dep't of Soc. Servs., 14 Va. App. 333, 338, 417 S.E.2d 1, 9 (1992) (construing the phrase in the context of Code § 16.2-283(C)(1)). "The law does not require [DSS] to force its services upon an unwilling or disinterested parent." Harris v. Lynchburg Div. of Soc. Servs., 223 Va. 235, 243, 288 S.E.2d 410, 415 (1982). Although mother indicated initially she was not interested in pursuing custody of C.T., DSS set a schedule of supervised visits in response to mother's desire for visitation. When mother expressed her willingness to file for custody of C.T., DSS referred her to employment services. Nothing in the record indicates mother required assistance with housing initially; however, when mother notified DSS she was separating from her husband, DSS provided her with the phone number of the housing authority, as well as information about a domestic abuse program. At that time, mother indicated she already had a list of rental agencies for low-income families.[2]

---

[2] Mother maintains the services provided by DSS were not reasonable and appropriate because DSS failed to offer counseling or other services that "could have led to the reunification" of mother and C.T. As nothing in the record indicates appellant presented this

- 8 -

When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests. See Toombs v. Lynchburg Div. Of Soc. Servs., 223 Va. 225, 230, 288 S.E.2d 405, 407-08 (1982); Farley, 9 Va. App. at 329, 387 S.E.2d at 796. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

> Virginia law recognizes the 'maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past." Petry v. Petry, 41 Va. App. 782, 793, 489 S.E.2d 458, 463 (2003). "As many courts have observed, one permissible 'measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child." Id. (citation omitted). "No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." Winfield v. Urquhart, 25 Va. App. 688, 696-97, 492 S.E. 2d 464, 467 (1997) (citations omitted).

Toms, 46 Va. App. at 267-68, 616 S.E.2d at 770 (2005).

The twelve-month time limit in Code § 16.1-283(C)(2) was "'designed to prevent an indeterminate state of foster care "drift" and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in [or required the continuation of] the foster care placement.'" Akers, 44 Va. App. at 256, 604 S.E.2d at 741 (2004) (quoting L.G. v. Amherst Cnty. Dep't of Soc. Servs., 41 Va. App. 51, 56, 581 S.E.2d 886, 889 (2003)). The best-interests-of-the-child inquiry dictates that the time limit in subsection (C)(2) cannot "temporally restrict" the trial court's consideration of what occurred with the parent and child

---

specific argument to the trial argument, we decline to consider it for the first time on appeal. Rule 5A:18. Rule 5A:18 requires that objections to a trial court's action or ruling be made with specificity in order to preserve an issue for appeal. See Nelson v. Commonwealth, 50 Va. App. 413, 420-21, 650 S.E.2d 562, 566 (2007).

"only during that discrete twelve-month time period to the exclusion of what may have occurred before and after those dates." L.G., 41 Va. App. at 57, 581 S.E.2d at 889. "Such a construction of the statute 'would deny the fact finder the opportunity to evaluate the *present* best interests of the child.'" Id. (quoting Roanoke City Dep't of Soc. Servs. v. Heide, 35 Va. App. 328, 337, 544 S.E.2d 890, 894 (2001)) (emphasis in L.G.).

Here, at the time mother's parental rights were terminated, C.T. had not resided with mother for nearly a decade. During that time, C.T. drifted between the homes of friends, her grandparents, and her father. Mother had failed to stay in touch with DSS and, when DSS finally located her, mother equivocated in her desire to provide C.T. with a home. When mother ultimately expressed a desire to seek custody of C.T., she did not provide DSS with the information necessary to evaluate her home as a potential placement or attend visitation with C.T. on a regular basis. Despite DSS' attempts to assist mother with employment and housing, mother had no job and was living with friends at the time of the termination hearing. C.T., on the other hand, was "doing very well" in her foster home and was no longer engaged in the inappropriate sexual behaviors she had exhibited in her grandparents' home. She had bonded with her foster family and was active in her school and community.

Based on this record, we cannot say the trial court erred in finding that DSS proved by clear and convincing evidence that mother had failed, without good cause, to make substantial progress towards eliminating the conditions requiring the continuation of C.T.'s foster care within twelve months of C.T.'s placement, and that termination of mother's residual parental rights was in C.T.'s best interests.

Accordingly, the decision of the trial court is affirmed.

Affirmed.