UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Chafin and Senior Judge Clements
Argued at Lexington, Virginia


JESSE BURNETTE

MEMORANDUM OPINION* BY
v.        Record No. 2049-17-3             JUDGE TERESA M. CHAFIN
JULY 31, 2018

ROANOKE CITY DEPARTMENT OF
 SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Charles N. Dorsey, Judge

Wayne D. Inge (Law Office of Wayne D. Inge, on brief), for
appellant.

(Daniel J. Callaghan, City Attorney; Heather P. Ferguson, Assistant
City Attorney; Valeria L. Cook, Guardian *ad litem* for the minor
child, on brief), for appellee.  Appellee and Guardian *ad litem*
submitting on brief.


On November 17, 2017, the Circuit Court of the City of Roanoke (circuit court)

terminated Jesse Burnette's residual parental rights pertaining to his son, G.F.  Burnette presents

three assignments of error on appeal:  that the circuit court erred in denying his motion for a

continuance at the September 15, 2017 hearing; that the court erred in terminating his parental

rights due to his failure, without good cause, to remedy the conditions that led to G.F.'s

continued placement in foster care for a period in excess of twelve months where Roanoke City

Department of Social Services (DSS) did not make reasonable efforts or provide reasonable and

appropriate services to reunite Burnette and G.F.; and that the court erred in terminating his

parental rights because it denied his motion to retain jurisdiction of the case to allow a family

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

member to petition for custody. For the reasons that follow, we affirm the circuit court's decision.

## I. BACKGROUND

"When reviewing a [circuit] court's decision on appeal, we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences." Boatright v. Wise Cty. Dep't of Soc. Servs., 64 Va. App. 71, 76, 764 S.E.2d 724, 727 (2014) (quoting Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003)). So viewed, the evidence is as follows.

G.F. was born substance-exposed on June 30, 2016. Due to the mother's history with DSS regarding substance abuse and inability to participate in services, DSS filed for an emergency removal and obtained custody of G.F. on July 7, 2016. G.F.'s mother identified Burnette as G.F.'s father, but she indicated to DSS that Burnette was incarcerated at that time and not aware of G.F. Because his paternity had not yet been established, Burnette's initial responsibilities toward achieving the stated goal for G.F. to return home were to establish paternity and to "participate in any beneficial services provided by the Roanoke City Jail." Once released, Burnette was to contact DSS to determine the appropriate services. Burnette's paternity was established on August 22, 2016.

During the time that Burnette was incarcerated, DSS made efforts to locate relatives who could potentially care for G.F. Burnette's mother expressed interest and began the paperwork and visitation process. She acknowledged to DSS that she had a brain tumor, but did not think it would impact her ability to care for G.F. However, the October 10, 2016 service plan review stated that she informed DSS that "one of her doctors . . . didn't think it was a good idea for her to get custody of an infant with her condition." The review then stated that she would "need to provide a letter from her physician stating that she is capable of taking care of a special needs

infant."[1] Ultimately, Burnette's mother did not file a petition for custody. Burnette's mother stopped participating in visitation once Burnette was released from jail on October 19, 2016, because she wanted to give Burnette a chance to obtain custody.

Once Burnette was out of jail, G.F.'s foster care worker, Reanna Wall, testified that she met with him in person and sent letters communicating his responsibilities toward G.F. and the services offered by DSS. She testified that she sent these letters to the address Burnette provided as his place of residence, which was his mother's house. Burnette was instructed to maintain consistent contact with DSS, complete a substance abuse program, demonstrate the ability to maintain appropriate housing, complete a parent skill-building class, participate in consistent visitation with G.F., maintain stable employment, and participate in individual counseling.

A visitation schedule was arranged for Burnette, establishing two hours of visitation time each week. Burnette attended two of the thirteen scheduled visits, and an additional unscheduled visit. Wall testified that on his first visit on October 26, 2016, Burnette seemed "overwhelmed" because he would ask the foster care worker to step in when G.F. started crying. When the foster care worker tried to give G.F. back to Burnette, Burnette asked to leave. On his second visit, on November 17, 2016, he stayed for only twenty minutes. Burnette's last visit was December 15, 2016, which was also attended by G.F.'s mother, and "wasn't a very productive visit" because the two ended up arguing. Visitation was later suspended after Burnette missed several scheduled visits. DSS attempted to set up three meetings to discuss reinstating visitation, but Burnette did not attend any of the meetings.

During the time that Burnette was released from jail, DSS referred Burnette to a parenting class. He attended one session before being removed due to absences. Burnette also failed to attend individual counseling. As for his housing situation, Burnette resided in his

_____

[1] The record does not appear to contain such a letter.

mother's house with his brothers. DSS conducted a home study of the residence while Burnette was incarcerated but did not get the opportunity to revisit the home while he was living in it. As for obtaining employment, Burnette informed DSS that he was working for a friend, but he did not provide any employment verification.

Approximately four months after he was released from jail, Burnette was incarcerated again on February 14, 2017. Burnette was released on May 31, 2017, only to be incarcerated again one week later on June 8, 2017, with an expected release date of March 27, 2018. Throughout the process, Burnette also failed to maintain consistent contact with DSS. DSS attempted to communicate with Burnette through in-person visits at the jail and through mailed letters. While incarcerated, Burnette did not respond to these letters or provide DSS with information as to how he planned to meet his responsibilities in order to return G.F. to his care. He did, however, advise DSS that he wished to "get out of jail and then complete his services" and that "he was counting on [G.F.'s mother] to do everything to achieve the goal of return home."[2]

G.F.'s foster care worker testified that he has been with his foster family since he was discharged from the hospital following his birth. Since being with the foster family, he successfully recovered from the pre-birth exposure to controlled substances, had surgery to correct an issue with his eye, and had been meeting all of his developmental milestones.

On April 27, 2017, DSS filed a petition in the Juvenile and Domestic Relations District Court of the City of Roanoke (JDR court) requesting the termination of Burnette's residual parental rights. The JDR court granted the petition and terminated his rights, while also changing the permanency planning goal from return home to adoption, on May 9, 2017.

_____

[2] G.F.'s mother voluntarily signed a permanent entrustment agreement terminating her parental rights. It was unclear if that had been expressly communicated to Burnette, but he was present at the hearing when the agreement was ratified.

Burnette appealed the JDR court's decision, and a *de novo* hearing was held concerning the matter in the circuit court on September 15, 2017. Burnette moved to continue the hearing until after his expected release from jail on March 27, 2018. The circuit court denied the motion.

At the hearing, Burnette testified that he was on a waiting list to begin the "Blue Ridge" program at the Botetourt-Craig Regional Jail. He testified that he never received a letter from DSS at his mother's house, but he acknowledged that Wall talked to him about the services he needed to complete. Burnette further testified that DSS did not set up or refer him to the required services and that he would have done anything for his son, despite his failure to attend the scheduled visitation arranged by DSS and his participation in only one session of parenting class before being dismissed for absences.

At the conclusion of evidence, the circuit court terminated Burnette's residual parental rights pertaining to G.F. pursuant to Code § 16.1-283(B) and 16.1-283(C)(2), finding the evidence sufficient to satisfy both grounds. The circuit court entered an order memorializing its decision on November 17, 2017. Burnette appealed the circuit court's decision to this Court.

## II. ANALYSIS

On appeal, Burnette contends that the circuit court erred by not continuing the case for him to pursue custody upon his prospective release from incarceration. He additionally contends that the evidence was insufficient for the circuit court to terminate his residual parental rights and that the court should have instead retained jurisdiction to allow relatives to petition for custody. Upon review, we conclude that the circuit court did not err in denying the continuance or in terminating Burnette's residual parental rights.

A. THE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE CONTINUANCE

Burnette argues that he was "defenseless" with "no agency to act on behalf of his son" due to his incarceration, and therefore the circuit court should have granted a continuance for him to pursue services after his expected release date of March 27, 2018. We disagree.

> The decision to grant a motion for a continuance is within the sound discretion of the circuit court and must be considered in view of the circumstances unique to each case. The circuit court's ruling on a motion for a continuance will be rejected on appeal only upon a showing of abuse of discretion and resulting prejudice to the movant.

Haugen v. Shenandoah Valley Dep't of Soc. Servs., 274 Va. 27, 34, 645 S.E.2d 261, 265 (2007).

Burnette argues that he was prejudiced by the denial of a continuance because his incarceration prevented him from participating in services and visitation. As of the date of the hearing on appeal to the circuit court, G.F. had already been in foster care for over twelve months. The continuance would have added an additional five months in foster care without resolution before Burnette could realistically begin participating in services, let alone complete them.

Moreover, "Virginia law recognizes the 'maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 267, 616 S.E.2d 765, 770 (2005) (quoting Petry v. Petry, 41 Va. App. 782, 793, 589 S.E.2d 458, 463 (2003)). "As many courts have observed, one permissible measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child." Id. at 268, 616 S.E.2d at 770 (quoting Petry, 41 Va. App. at 793, 589 S.E.2d at 463). "No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." Id. (quoting Winfield v. Urquhart, 25 Va. App. 688, 696-97, 492

S.E.2d 464, 467 (1997)).  Despite being incarcerated for the third time since G.F.'s removal, Burnette was at liberty for approximately four months where DSS formulated and arranged services appropriate to his and G.F.'s needs.  Of these arranged services, Burnette was dismissed from parenting classes due to his lack of attendance, and DSS ceased scheduled visitation because Burnette stopped attending.

Upon consideration of the time that had already passed and Burnette's prior level of commitment to completing the services recommended by DSS, the circuit court denied the continuance.  Upon review, we cannot say that the circuit court abused its discretion.

### B.  THERE WAS SUFFICIENT EVIDENCE TO TERMINATE BURNETTE'S RESIDUAL PARENTAL RIGHTS

Burnette further argues on appeal that his parental rights were improperly terminated because he had nothing to do with the events leading to G.F.'s emergency removal and placement in foster care.  He also argues that because he did not know that G.F.'s mother was pregnant, and because he was incarcerated when G.F. was born, "the only condition [he] had to remedy was to get out of jail and then stay out."  He contends that because he was in jail, he was unable to "defend himself" and participate in the services offered by DSS, as well as secure alternative placement of G.F. with a relative.

We recognize that "termination of residual parental rights is a grave, drastic, and irreversible action," Helen W. v. Fairfax Cty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991), and in our appellate review, we presume the trial court "to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests," Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991) (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)).  "The trial court's judgment, 'when based on evidence heard

*ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citation omitted).

Code § 16.1-283 provides multiple carefully defined bases for the termination of residual parental rights, and where a circuit court's decision is made on alternative grounds, this Court must only consider whether any one of the alternatives is a sufficient basis to sustain the circuit court's judgment. If so, this Court need not address the alternative basis. See Boone v. C. Arthur Weaver Co., 235 Va. 157, 161, 365 S.E.2d 764, 766 (1988). Here, the circuit court found the evidence sufficient to terminate Burnette's residual parental rights under both Code § 16.1-283(B) and Code § 16.1-283(C)(2). Because we find that termination under Code § 16.1-283(C)(2) was supported by the evidence, we need not address termination under Code § 16.1-283(B).

Code § 16.1-283(C)(2) permits a court to terminate a parent's residual parental rights where clear and convincing evidence establishes that such a termination is in the best interests of the child at issue and:

> [t]he parent . . . , without good cause, [has] been unwilling or unable within a reasonable period of time not to exceed [twelve] months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Terminations under this subsection "hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes" during the period in which services were offered. Toms, 46 Va. App. at 271, 616 S.E.2d at 772. For this reason, DSS must show that "reasonable and appropriate" services were offered to rehabilitate the parent within the given timeframe. Id. at 269, 616 S.E.2d at 771; see also Code § 16.1-283(C)(2). What constitutes "'[r]easonable and appropriate'

- 8 -

efforts can only be judged with reference to the circumstances of a particular case." Ferguson v. Stafford Cty. Dep't of Soc. Servs., 14 Va. App. 333, 338, 417 S.E.2d 1, 9 (1992).

Here, Burnette did not demonstrate his ability "within a reasonable period of time . . . to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of [DSS]." Code § 16.1-283(C)(2). As stated in the foster care service plan filed on August 9, 2016, Burnette's initial responsibilities were to first establish paternity, and then to contact DSS upon release to determine the appropriate services. The plan also stated that Burnette "needs to participate in any beneficial services provided by the Roanoke City Jail" and that "[c]consistent visitations" would be one of the services upon release that would facilitate G.F.'s return home to Burnette.

Once released from jail, G.F.'s foster care worker met with Burnette and mailed him letters to advise him of his responsibilities for regaining custody of G.F. A visitation schedule was arranged, and Burnette attended only two of his scheduled thirteen visits, plus one unscheduled visit. In his second, and last, scheduled visit, Burnette asked the foster care worker to console G.F. when he started crying, then asked to leave when she tried to give him back. When Burnette failed to attend subsequent scheduled visits, DSS ended the visitation schedule.

In addition to failing to maintain consistent visitation during his release from incarceration, Burnette failed to complete the required parenting class. After attending only one class, he was dismissed due to his absences from the subsequent classes. Burnette further failed to provide DSS with proof of stable employment, alleging only that he was working for a friend. Throughout the proceedings, Burnette has also taken conflicting positions on his housing status, providing DSS with his mother's address as his mailing address, then claiming that he did not receive the mail because it was not his residence.

He argues that DSS failed to arrange reasonable services appropriate to his needs, but the evidence establishes otherwise. The evidence shows that DSS arranged services, including visitation and parenting classes, that would serve to strengthen the parent-child relationship that Burnette would need to develop with G.F. in order to effectively parent the child upon regaining custody. Instead, Burnette did not avail himself of the arranged services when he was released from jail and had the opportunity to do so.

Furthermore, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). G.F. has been living with his foster family since he was released from the hospital following his birth. Burnette was out of jail for approximately four months of G.F.'s life, and failed to adhere to his parental responsibilities before becoming incarcerated again. Meanwhile, G.F. was successfully weaned from the controlled substances and has been meeting all of his developmental milestones while placed with his foster family.

While Burnette's incarceration is not sufficient in and of itself to support the termination of his residual parental rights, "it is a valid and proper circumstance which, when combined with other evidence concerning the parent/child relationship, can support a court's finding by clear and convincing evidence that the best interests of the child will be served by termination." Ferguson, 14 Va. App. at 340, 417 S.E.2d at 5; see also Harris v. Lynchburg Div. of Soc. Servs., 223 Va. 235, 242, 288 S.E.2d 410, 414 (1982) (declining to consider "incarceration as reason to . . . say that [a parent's] failure to remedy the conditions . . . was without good cause"). As noted above, other evidence shows that Burnette failed to utilize his release from jail to take advantage of the services arranged by DSS and foster a parent/child relationship with G.F.

- 10 -

For these reasons, the evidence presented in this case established that Burnette failed to remedy the conditions that led to G.F.'s continued placement in foster care within a reasonable time despite the services offered to him by DSS. The evidence supports the circuit court's decision that the termination of Burnette's residual parental rights was in G.F.'s best interests.

### C. THE CIRCUIT COURT DID NOT ERR IN PROCEEDING WITH THE TERMINATION AND DECLINING TO RETAIN JURISDICTION[3]

Burnette argues that the circuit court erred in terminating his parental rights because the court "denied [his] motion to retain jurisdiction of the case to allow one or more family members . . . to file a petition for custody." In his opening brief, Burnette appears to argue that G.F. was unable to be placed with a family member because Burnette could not make arrangements for alternative placement due to his incarceration.

Code § 16.1-283(A) provides that, in a termination of parental rights case, "the court shall give consideration to granting custody to relatives of the child, including the grandparents." Furthermore, "[b]efore termination of parental rights by the court, the agency seeking termination has an affirmative duty to investigate all reasonable options for placement with immediate relatives." Sauer v. Franklin Cty. Dep't of Soc. Servs., 18 Va. App. 769, 771, 446 S.E.2d 640, 641 (1994).

Here, despite his own incarceration, Burnette does not dispute that DSS investigated relative placement for G.F. DSS sent letters to relatives shortly after G.F.'s emergency removal.

---

[3] Burnette also contends the circuit court erred in approving the permanency planning order changing the goal from returning G.F. home to adoption. We note that "[a] preponderance-of-the-evidence standard governs judicial review of the foster care plan recommendations, while the more stringent clear-and-convincing-evidence standard applies to the ultimate termination decision." Najera v. Chesapeake Div. of Soc. Servs., 48 Va. App. 237, 240, 629 S.E.2d 721, 722 (2006). Therefore, because we conclude that the circuit court did not err in terminating his parental rights under the more stringent standard, this decision "necessarily subsumes" Burnette's challenge to the permanency planning order. See Toms, 46 Va. App. at 265 & n.3, 616 S.E.2d at 769 & n.3.

G.F.'s foster care worker spent time preparing Burnette's mother as an alternative placement for G.F. Visitation and a home study were underway, but once Burnette was released from jail the first time, his mother stopped her pursuit of custody in favor of Burnette working toward custody. Burnette's mother also informed DSS that her doctor advised against taking custody of an infant due to her brain tumor. For this reason, DSS required a letter from her physician stating that she was capable of caring for a special needs infant. Ultimately, however, Burnette's mother did not file a petition for custody.

At the termination hearing, Burnette asked the court to retain jurisdiction for his mother to pursue custody. He argued that she had attempted to file a petition the day prior to the termination hearing but did not have all the necessary information. DSS and the guardian *ad litem* for G.F. argued, however, that such efforts were "simply too late," since G.F. had already been in foster care for over twelve months.

The circuit court was aware of these circumstances and took them into consideration when terminating Burnette's parental rights. Because the record shows that the statutory requirements for investigating relative placement were satisfied, we cannot say the circuit court erred in denying Burnette's motion and terminating his parental rights.

## III. CONCLUSION

For the reasons stated, we affirm the circuit court's decision.

<u>Affirmed.</u>